**Affirmed and En Banc Majority Opinion and En Banc Dissenting Opinions filed May 18, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00967-CV

---

## WERNER ENTERPRISES, INC. AND SHIRAZ A. ALI, Appellants

## V.

## JENNIFER BLAKE, INDIVIDUALLY AND AS NEXT FRIEND FOR NATHAN BLAKE, AND AS HEIR OF THE ESTATE OF ZACHERY BLAKE, DECEASED; AND ELDRIDGE MOAK, IN HIS CAPACITY AS GUARDIAN OF THE ESTATE OF BRIANA BLAKE, Appellees

---

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2015-36666**

---

## E N  B A N C  M A J O R I T Y  O P I N I O N

A trucking company and its employee-trainee-driver appeal the trial court's judgment awarding over $100 million after a twenty-five-day trial over six weeks that produced a 4,733-page Reporter's Record, a 5,882-page Clerk's Record, 28,657 pages of exhibits, and appellate briefs from both parties that permissibly exceeded

rule-imposed word limits.  A majority of this Court voted to consider this matter en banc.  We affirm.

ISSUES

Appellants Werner Enterprises Inc. and Shiraz A. Ali (together, "Appellants") frame their appeal as raising six issues:  (1) legal and factual sufficiency with respect to the jury's negligence liability finding against the driver (Ali), (2) legal and factual sufficiency with respect to the jury's negligence liability findings against the trucking company (Werner), (3) jury charge issues, (4) apportionment issues, (5) admission of five different pieces of evidence, and (6) the jury's award of future medical care expenses.

BACKGROUND

## I.      Summary

Trey Salinas was driving a vehicle with Jennifer Blake and her three children on eastbound Interstate 20 ("I-20") near Odessa, Texas on December 30, 2014, during a National Weather Service Winter Storm Warning.  Salinas lost control of the vehicle and it crossed the 42-foot-wide grassy median before colliding with an 18-wheeler traveling over 40 miles per hour.  Ali was driving the 18-wheeler, which was owned by Werner Enterprises (the "Werner Truck").

As a result of the collision, seven-year-old Zachery Blake died, his 12-year-old sister, Brianna Blake, suffered a severe traumatic brain injury and was rendered a quadriplegic, and fourteen-year-old Nathan Blake suffered a broken shoulder blade, broken collar bone, bruised lung, and other injuries.  Jennifer Blake suffered a mild traumatic brain injury, contusions, a hematoma, and other injuries.

Appellees Jennifer Blake, individually and as next friend for Nathan Blake and as heir of the estate of Zachary Blake, and Eldridge Moak, in his capacity as

2

Guardian of the Estate of Brianna Blake (together, "the Blakes"), sued Appellants for damages stemming from the collision. The jury found both Appellants liable and assessed over $100 million in damages. The trial court signed a final judgment on July 30, 2018. Appellants timely appealed.

## II.    Relevant Facts

The jury heard the following:

(1)    two weeks before his collision with the Blakes' vehicle, Ali received the second-lowest possible score on an evaluation from a Werner supervisor (an 8 out of 21);

(2)    Ali knew he was driving in "freezing rain";

(3)    freezing rain is the sole cause of black ice;

(4)    even "misting" generates a sufficient amount of water to give rise to black ice if it is below freezing;

(5)    black ice is almost invisible;

(6)    with black ice, traction becomes almost non-existent;

(7)    there was black ice at the scene of Ali's collision with the Blakes — "[i]t was like a skating rink";

(8)    that area of I-20 was "covered" in ice;

(9)    there was a National Weather Service Winter Storm Warning in effect at the time of the collision;

(10)    a Winter Storm Warning meant "that whatever condition they're warning of is either imminent or occurring";

(11)    it is critical for drivers to monitor weather updates in such an environment so that they can know when the "happening soon" changes to "happening now";

3

(12) if weather conditions are unsafe, drivers should "absolutely" not drive, "no debate there";

(13) Ali acknowledged that Werner taught or trained him that "we know what the consequences are if a passenger vehicle loses control on ice in front of a 30- or 40-ton 18-wheeler going highway speeds";

(14) Werner's director of safety acknowledged that "all vehicles, certainly passenger vehicles included, are more likely to lose control on icy roads" and that "[n]obody should drive on ice";

(15) Texas Department of Public Safety State Trooper Corey Vanderwilt testified he (a) observed a section of I-20 just west of Odessa that was covered in ice; (b) believed that section of I-20 was unsafe to drive on; (c) was driving at 5 to 10 miles per hour (with his emergency lights on) in these conditions; (d) saw a vehicle pass his vehicle at 20 to 30 miles per hour; (e) believed 20 to 30 miles per hour was too fast based on the road conditions; (f) watched said vehicle lose control, slide across the median, and collide with another vehicle traveling the opposite direction; (g) cited the driver of said vehicle for driving at an unsafe speed; (h) believed said driver should have known there was ice because she was driving on ice westbound and "she was in it. Everybody was. As many crashes as I'm sure she's passed along the way, she should have known that going at that rate of speed that she was going was unsafe for those roadway conditions"; and (i) to the best of his recollection, the road surface conditions at the site worsened over time;

(16) Ali drove past the collision Officer Vanderwilt was working four and a half minutes before he collided with the Blakes' vehicle;

(17) Texas Department of Public Safety Officer Christopher Weimer testified (a) he responded to a one-car accident that had occurred at 3:00 p.m.; (b) he arrived on-scene at 3:43 p.m. and observed the icy condition of the overpass where the accident occurred; (c) his crash report stated that the driver was "traveling at an unsafe speed for the icy road conditions", struck a center concrete barrier, and came to rest facing eastward in the center median; (d) he was told the car slid on the

4

ice that was on I-20 westbound; and (e) he observed yet another one-vehicle accident that occurred about 100 feet away;

(18) Officer Weimer also (a) observed a pickup truck traveling at an unsafe speed on westbound I-20, lose control on the ice, and crash; (b) wrote in his report that the truck was "traveling at an unsafe speed for the icy road conditions"; (c) turned on his emergency lights when he arrived on the scene at 3:43 p.m.; and (d) did not turn off his emergency lights earlier than 4:30 p.m.;

(19) Ali both (a) passed the collision Officer Weimer was working at approximately 3:53 p.m. (37 minutes before his collision with the Blakes) and (b) testified he is sure he saw Officer Weimer's vehicle with its emergency lights on when he passed it;

(20) Texas Department of Public Safety Officer Chad Matlock testified that he traveled to the site of Ali's collision with the Blakes' vehicle westbound on I-20 and recalled with "hundred percent" certainty that "the roads were icy";

(21) Andrew Gambs (a certified EMT paramedic) testified he (a) was traveling eastbound on I-20 about three miles west of Ali's collision with the Blakes' vehicle when he heard about it on his radio; (b) went straight to the site (which took about 5 minutes); (c) was the first emergency responder on the scene; (d) slipped on ice on westbound I-20 when he was running to get a backboard 10-15 minutes after he arrived; (e) saw it was sleeting lightly when he arrived; and (f) perceived westbound I-20 to be very icy;

(22) Dylan Hand testified he (a) was driving a vehicle eastbound on I-20 near the site of Ali's collision with the Blakes' vehicle when it occurred; (b) believed the Werner Truck was traveling too fast for the weather conditions; (c) believed the conditions of the road were too icy for 18-wheelers; (d) stopped his vehicle to see if he could be of assistance; (e) perceived eastbound I-20 to be so icy that he could barely walk on it with tennis shoes; and (f) saw it was sleeting at the scene;

(23) Andy Irwin (Appellants' accident-reconstruction expert) testified that (a) Ali drove the Werner Truck through freezing rain somewhere before his collision with the Blakes' vehicle; (b) photographs of the Werner

5

Truck taken after the collision show ice was caked up on the leading edges of the antennas and the mirrors and above the windshield; and (c) he believed the ice got there because the Werner Truck had been driven through freezing rain;

(24) James Wampler (a local tow truck driver) was driving between 10 and 15 miles per hour on I-20 that day due to the weather conditions;

(25) despite these conditions, Ali was driving his 18-wheeler at approximately 43 miles per hour at the time of his collision with the Blakes;

(26) Ali's supervisor (who was in the truck with him) was asleep at the time of the collision;

(27) Werner knew its supervisor could not supervise Ali if he was asleep;

(28) "the roads were so icy" people "couldn't drive very fast" or they would "go[ ] out of control";

(29) if Ali "had followed the safety rule that dictates what a driver of an 18-wheeler is supposed to do once he hit icy roads", then the Blakes would not have suffered their injuries;

(30) there were at least 10 truck stops at which Ali could have stopped between Midland and Odessa;

(31) it is "really important for the driver to monitor the outside air temperature . . . because we know once it drops below 32, that's the condition that creates freezing water and therefore, freezing rain and black ice";

(32) despite the existence of available devices to check for conditions giving rise to black ice (including OAT gauges and CB radios), Ali's supervisor prohibited him from utilizing either device;

(33) "any person driving any kind of vehicle" should know that they are driving "into an area where the National Weather Service says that we're going to have freezing rain accumulating into ice . . . and then issue an update . . . that changes it to freezing rain";

6

(34) Werner had 13 truck driving schools that graduated approximately 5,000 students a year (and hired approximately 2,000 of those graduates);

(35) federal regulations require states to provide pre-approved information manuals to applicants for commercial drivers' licenses;

(36) Texas created such a manual;

(37) said manual is designed to promote safety and save lives;

(38) said manual includes section 2.6.2, entitled "Matching Speed";

(39) section 2.6.2 instructs drivers to reduce their speed to a crawl when they encounter icy roads;

(40) a "crawl" in the trucking industry means between 10 and 15 miles per hour;

(41) the purpose of coming to a crawl is to stop at the first safe place;

(42) drivers have no discretion concerning the application of rule 2.6.2;

(43) Werner teaches drivers that they have the discretion whether to come to a crawl or stop in icy conditions unless "they feel that they're unsafe";

(44) Ali personally believed that 2.6.2 was "a very good recommendation" that drivers are "not required to follow";

(45) it is "ludicrous" to not follow 2.6.2 because drivers should not "have to have a wreck before [they] find out that [they] shouldn't have had a wreck";

(46) Werner taught its truck driving students that if they felt unsafe, they should stop but if they did not feel unsafe, to keep going;

7

(47)  Werner's director of safety testified that even with low scores, Ali had "a commercial driver's license from the State of Texas, so he could drive a truck by himself without anybody in it";

(48)  the head of safety's foregoing interpretation could represent "a very dangerous mistake";

(49)  Werner's director of safety was "not really involved" in issues relating to drivers' uses of OAT gauges or CB radios and was unfamiliar with Werner's practice of pairing student drivers with trainers on just-in-time ("JIT") runs;

(50)  drivers should use anything in their truck that helps them operate it safely;

(51)  even if drivers match their speed to their road condition, they may still "need to reduce it slower";

(52)  Ali was "looking for spray coming from cars in front . . . I mean, if there's spray coming from cars, it's not icy";

(53)  Ali's method is the number one method utilized by Werner's drivers;

(54)  Ali's method for gauging whether the road was icy was flawed because drivers "cannot look at spray coming off a tire when there has been freezing rain and there's been moisture in the air. There's going to be a small, thin layer on top of solid ice and it's even more slippery";

(55)  Werner did not convey any information about the Winter Storm Warning to its drivers because "it was a localized event";

(56)  the Winter Storm Warning was in effect for almost all areas of Midland and Odessa;

(57)  despite these facts, Werner assigned Ali a JIT run on December 30, 2014 through parts of West Texas while that area was under a Winter Storm Warning;

(58)  JIT runs have a one hundred percent on-time expectation;

8

(59)  late delivery on a JIT run can result in discipline;

(60)  four late loads can result in termination;

(61)  Werner required Ali to drive the first shift from Dallas on that highway that day at that time because student drivers are not allowed to drive past midnight;

(62)  Ali not only had not taken Werner's "Winter Driving Training Module", but *he had to ask the Blakes' counsel* what Werner's winter driving training module was even called to ensure it was not on a list of the trainings Werner provided him;

(63)  Ali's truck collided with the Blakes' vehicle during a Winter Storm Warning on black ice;

(64)  the parties effectively agreed Ali was driving at least 43 miles per hour at the time of impact;

(65)  Ali was traveling at approximately 50 miles per hour when the Blakes' vehicle lost control and crossed the median;

(66)  after impact, it looked as if the Blakes' vehicle had been "cut in half"; and

(67)  the Blakes suffered catastrophic and life-altering injuries as a result of the collision.

The jury was asked four liability questions, which yielded the following findings:

**Question 1**  Werner's negligence acting through its employees other than Ali was a proximate cause of the injuries in question.

**Question 2**  Werner's negligence acting through its employees other than Ali was a proximate cause of the injuries in question with respect to two specific actions:  (1) supervising Ali, or (2) training Ali.

**Question 3**  Ali's negligence was a proximate cause of the injuries in

9

question.

**Question 4**    Salinas's negligence was a proximate cause of the injuries in question.

The following three apportionment questions also were submitted in the charge:

## Question 5

[the jury was instructed to respond to this question if it answered "Yes" to  Questions 1, 2, 3, or 4 for more than one of those named below]

For each person you found caused or contributed to cause the injuries, find the percentage of responsibility attributable to each:

| | |
|---|---|
| Werner, acting through its employees other than Shiraz Ali | 70% |
| Shiraz Ali | 14% |
| Zaragoza "Trey" Salinas | 16% |
| Total | 100% |

## Question 6

[the jury was instructed to respond to this question if it answered "Yes" to Questions 1, 3, or 4 for more than one of those named below]

For each person you found caused or contributed to cause the injuries, find the percentage of responsibility attributable to each:

| | |
|---|---|
| Werner, acting through its employees other than Shiraz Ali | 30% |
| Shiraz Ali | 32% |
| Zaragoza "Trey" Salinas | 38% |
| Total | 100% |

## Question 7

10

[the jury was instructed to respond to this question if it answered "Yes" to Questions 3 or 4 for more than one of those named below]

For each person you found caused or contributed to cause the injuries, find the percentage of responsibility attributable to each:

| | |
|---|---|
| Shiraz Ali | 45% |
| Zaragoza "Trey" Salinas | 55% |
| Total | 100% |

## ANALYSIS

### I. Ali's Negligence

We begin our analysis by addressing Appellants' first issue, in which they contend that the evidence is legally and factually insufficient to support the jury's liability finding against Ali.

### A. Standard of Review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not do so. *Id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *Id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *Id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record (here, more than 10,000 pages), considering both the

11

evidence in favor of, and contrary to, the challenged finding. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp.*, 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

**B.    Duty**

Appellants first assert that the evidence is legally and factually insufficient to show Ali owed any duty to the Blakes. We disagree.

The threshold inquiry in a negligence case is duty and the existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *See Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017). Under this court's precedent, Ali had a common law duty to operate the Werner Truck at a speed at which an ordinarily prudent person would operate it under the same or similar circumstances. *See Fitzgerald v. Russ Mitchell Constructors, Inc.,* 423 S.W.2d 189, 191 (Tex. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.); *accord Golleher v. Herrera*, 651 S.W.2d 329, 332-33 (Tex. App.—Amarillo 1983, no writ); *Adams v. Morris*, 584 S.W.2d 712, 717 (Tex. App.—Tyler 1979, no writ); *Hokr v. Burgett*, 489 S.W.2d 928, 930 (Tex. App.—Fort Worth 1973, no writ); *Billingsley v. S. Pac. Co.*, 400 S.W.2d 789, 794 (Tex. App.—Tyler 1966, ref'd n.r.e.). The speed at which an ordinarily prudent person would drive under the same

12

or similar circumstances may be below the speed limit. *See Golleher*, 651 S.W.2d at 332-33; *Adams*, 584 S.W.2d at 717; *Hokr*, 489 S.W.2d at 930; *Fitzgerald,* 423 S.W.2d at 191; *Billingsley*, 400 S.W.2d at 794.

Every individual has the duty to guard against foreseeable risks. *See generally Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 100 (N.Y. 1928) ("[T]he orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty."). The Supreme Court of Texas has consistently held that foreseeability turns on the existence of a general danger, not awareness of the exact sequence of events that produces the harm. *See Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 565 (Tex. 2015). "The general danger of driving is obvious to everyone." *Id.*; *see also* Tex. Dep't of Transp., Public Service Announcement (Nov. 2021), https://www.txdot.gov/inside-txdot/media-center/psas/end-streak.html ("This November 7, Texas marks 21 years of daily deaths on our roadways with more than 75,000 innocent lives lost to preventable fatal crashes. For the past several years, about 10 people have died every day in crashes in the state.").

Appellants nonetheless suggest that Ali had no duty to anticipate that a passenger vehicle driving eastbound on I-20 might lose control of their vehicle (whether negligently or otherwise) under the conditions presented, cross the median, and obstruct Ali's right of way while he was traveling at approximately 50 miles per hour under those same circumstances. Drivers' excessive highway speed may foreseeably lead to a collision with another vehicle that enters the wrong lane of traffic. *See Biggers v. Cont'l Bus Sys., Inc.*, 303 S.W.2d 359, 363 (Tex. 1957). Ali was therefore duty-bound as a matter of law to operate the Werner Truck at a speed at which an ordinarily prudent person would operate it under the same or similar

13

circumstances.  *Golleher*, 651 S.W.2d at 332-33.[1]

We reject Appellants' attempt to reframe the question of law concerning Ali's duty as a question concerning sufficiency because binding precedent dictates such a duty exists (even without the aforementioned particularized facts herein).  We therefore reject Appellants' argument that the evidence is legally and factually insufficient to show that Ali owed any duty to the Blakes.

## C.    Breach

Appellants next assert that there is legally and factually insufficient evidence to support a finding that Ali breached any duty.  We disagree.

Ali testified that there was no ice anywhere on I-20 from the time he left Dallas until the time of the collision at issue and that if the roads were icy, he should have slowed to "a crawl" — 10 or 15 miles per hour or less — and stopped driving as soon as he could safely do so.  Carlos Romay, a director of safety for Werner, testified that Ali should not drive through ice.  Several witnesses testified that the stretch of roadway where Ali collided with the Blakes was "covered" in ice and the jury heard evidence of other contemporaneous collisions on that stretch of I-20.

Arthur Atkinson, the Blakes' truck safety expert, further testified that a reasonably prudent truck driver in Ali's situation would have (1) known that more likely than not he was driving on ice and (2) slowed to a crawl and exited the highway.  Atkinson stated that slowing to "a crawl" means 10 to 15 miles per hour

---

[1] We acknowledge Appellants also contend (1) Ali had no duty to actively monitor the weather conditions on I-20 and (2) the Blakes improperly relied upon title 49, section 392.14 of the Code of Federal Regulations (and section 2.6.2 of the Texas Commercial Motor Vehicle Drivers Handbook) to prove Ali's duties.  Even when we accept these arguments *arguendo*, neither one negates Ali's pre-existing duty to operate the Werner Truck at a speed at which an ordinarily prudent person would operate it under the same or similar circumstances.  *See Golleher*, 651 S.W.2d at 332-33; *Adams*, 584 S.W.2d at 717; *Hokr*, 489 S.W.2d at 930; *Fitzgerald,* 423 S.W.2d at 191; *Billingsley*, 400 S.W.2d at 794.

14

or slower, and no faster than 15 miles per hour. Ali was nonetheless traveling at three times that speed when the vehicle in which the Blakes were traveling lost control.

Although Appellants assert that Ali was driving well below the posted speed limit of 75 miles per hour, the speed at which an ordinarily prudent person would operate a vehicle under the same or similar circumstances may be below the speed limit. *See Golleher*, 651 S.W.2d at 332-33; *Adams*, 584 S.W.2d at 717; *Hokr*, 489 S.W.2d at 930; *Fitzgerald,* 423 S.W.2d at 191; *Billingsley*, 400 S.W.2d at 794. Evidence at trial showed that the Werner Truck was traveling at about 50 miles per hour when Ali hit the brakes and that Officer Vanderwilt issued a citation to a driver of a passenger vehicle for driving at an unsafe speed because the driver was driving 20 to 30 miles per hour on I-20 about 4.5 miles east of the location where Ali hit the Blakes' vehicle. Given his speed under the circumstances, the fact that Ali was driving under the speed limit is irrelevant to our analysis. *See* Tex. Transp. Code Ann. § 545.351(b)(1) (stating that "[a]n operator . . . may not drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for actual potential hazards then existing"); *id*. § 545.351(c) (stating that "[a]n operator shall, consistent with Subsections (a) and (b), drive at an appropriate reduced speed if . . . a special hazard exists with regard to traffic, including . . . weather or highway conditions").

Appellants also assert (1) Ali was driving within his lane of travel, on an open road, with the right of way, and in control of his vehicle; (2) when Ali realized that the vehicle in which the Blakes were traveling was out of control (two seconds before impact), Ali responded in a reasonable and prudent manner by braking and bringing the Werner Truck to a controlled stop; and (3) Ali never lost traction or experienced any diminished visibility. Even presuming for the sake of argument

that each of these propositions is true, we nonetheless conclude that the trial evidence would enable reasonable and fair-minded people to find that (1) Ali did not operate the Werner Truck at a speed at which an ordinarily prudent person would operate it under the same or similar circumstances; (2) Ali did not operate the Werner Truck at a speed at which an ordinarily prudent commercial truck driver would operate it under the same or similar circumstances; (3) Ali was negligent in the operation of the Werner Truck; and (4) Ali was negligent in the operation of the Werner Truck at the time of the occurrence in question. *See City of Keller*, 168 S.W.3d at 823, 827; *Golleher*, 651 S.W.2d at 332-33; *Adams*, 584 S.W.2d at 717; *Hokr*, 489 S.W.2d at 930; *Fitzgerald,* 423 S.W.2d at 191; *Billingsley*, 400 S.W.2d at 794. Examining the entire record, considering and weighing both the evidence in favor of and contrary to each of these four findings, we conclude that none of these four findings is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp.*, 971 S.W.2d at 406-07; *Golleher*, 651 S.W.2d at 332-33; *Adams*, 584 S.W.2d at 717; *Hokr*, 489 S.W.2d at 930; *Fitzgerald,* 423 S.W.2d at 191; *Billingsley*, 400 S.W.2d at 794.

### D. Causation

Appellants also assert that the evidence is legally and factually insufficient to support a finding that Ali's negligence proximately caused the injuries in question or the collision. In Question 3, the trial court asked the jury, "Was the negligence, if any, of Shiraz Ali in the operation of the Werner Truck on December 30, 2014, a proximate cause of the injuries in question?"[2] The jury answered "yes". Ali testified

---

[2] The trial court instructed the jury that "'Proximate cause,' when used with respect to the conduct of Shiraz Ali, means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a commercial truck driver using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury."

that Werner taught or trained him that "we know what the consequences are if a passenger vehicle loses control on ice in front of a 30- or 40-ton 18-wheeler going highway speeds." Ali also agreed that he knows passenger vehicles are much more likely to lose control than an 18-wheeler on an icy road.

James Crawford, the Blakes' accident-reconstruction expert, testified that if Ali had been operating the Werner Truck at 15 miles per hour and if Ali took the same actions by promptly pressing on the brakes as hard as Ali could, the collision with the Blakes never would have happened. The jury also saw Crawford's animation showing that if the Werner Truck had been traveling 15 miles per hour when the Blakes' vehicle crossed the westbound lanes of I-20, the Werner Truck would not have collided with the Blakes. Andy Irwin, Appellants' accident-reconstruction expert, testified that the collision would not have occurred if the Werner Truck had been traveling at 15 miles per hour and in the same location on I-20 westbound at the time of the collision. Irwin testified that in this scenario, the Werner Truck would have come to a stop "before the crash happen[ed]" and that "had [Ali] been at 15 [miles per hour] and assuming no other changes to the stream of traffic, [Ali] doesn't have the crash. That's a mathematical fact."

After considering the trial evidence in the light most favorable to the challenged jury finding, we conclude that the trial evidence would enable reasonable and fair-minded people to find that (1) Ali's failure to operate the Werner Truck at a speed at which an ordinarily prudent commercial truck driver would operate it under the same or similar circumstances was a proximate cause of the occurrence and injuries in question; (2) Ali's failure to operate the Werner Truck at a speed at which an ordinarily prudent person would operate it under the same or similar circumstances was a proximate cause of the occurrence and injuries in question; (3) Ali's negligence was a substantial factor in bringing about the Blakes' injuries and

17

the collision, without which these injuries and this collision would not have occurred; and (4) Ali's negligence was such that a commercial truck driver or a person using ordinary care would have foreseen that the collision or the Blakes' injuries (or some similar collision or injury) might reasonably result therefrom under the circumstances. *See City of Keller*, 168 S.W.3d at 823, 827; *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 387 (Tex. 1989); *Biggers*, 303 S.W.2d at 363-67; *Villarreal v. Zouzalik*, 515 S.W.2d 742, 745 (Tex. App.—San Antonio 1974, no writ). Examining the entire record, considering and weighing both the evidence in favor of, and contrary to, each of these four findings, we conclude that each of these four findings is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Maritime Overseas Corp.*, 971 S.W.2d at 406-07; *Lofton*, 777 S.W.2d at 387; *Villarreal*, 515 S.W.2d at 745; *Biggers*, 303 S.W.2d at 363-67.

We conclude that the trial evidence is legally and factually sufficient to support a finding that Ali's negligence in operating the Werner Truck was a proximate cause of the collision at issue and the Blakes' injuries. We overrule Appellants' first issue.

## II.    Jury Charge Issues

In their second issue, Appellants assert numerous charge errors. Specifically, they contend "the charge's many defects included directing the jury to consider numerous invalid legal theories, omitting any question concerning whether Ali or Werner caused this accident, and omitting a requested sudden emergency instruction applicable to circumstances just like these." We disagree.

### A.    *Casteel* Charge Errors

Appellants first argue that the submission of Jury Questions 1, 2, 3, 5, 6, and 7 constitutes harmful error requiring reversal under *Crown Life Insurance Co. v.*

*Casteel*, 22 S.W.3d 378 (Tex. 2000), because the liability questions submitted in Questions 1,[3] 2,[4] and 3[5] commingled multiple theories of liability and allowed the jury to return a single answer regarding liability when most or all of the theories advanced by the Blakes were legally invalid.  Appellants argue that this submission also affected the apportionment questions submitted to the jury in Questions 5, 6, and 7, thereby causing harmful error.  In response, the Blakes argue (in relevant part) that Appellants did not preserve their *Casteel* complaint.  We agree with the Blakes.

To preserve a *Casteel* complaint, the complaining party must make a timely *and specific* objection plainly informing the trial court of the specific complaint.  *See* Tex. R. Civ. P. 274; *Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014) ("As a general rule, preservation requires (1) a timely objection 'stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context,' and (2) a ruling.") (quoting Tex. R. App. P. 33.1); *Thota v. Young*, 366 S.W.3d 678, 691 (Tex. 2012) ("In every case in which we have considered *Casteel*'s presumed harm analysis, including *Casteel* itself, we have

---

[3] Question 1 asked:  "Was the negligence, if any, of Werner acting through its employees other than Shiraz Ali a proximate cause of the injuries in question?"

[4] Question 2 asked:  "Was the negligence, if any, of Werner acting through its employees other than Shiraz Ali in the manner stated below a proximate cause of the injuries in question?"

[5] Question 3 asked:  "Was the negligence, if any, of Shiraz Ali in the operation of the Werner truck on December 30, 2014, a proximate cause of the injuries in question?"  At the charge conference, the trial court overruled various objections by Appellants to Question 3, including the following:  (1) the trial court should change each reference in Question 3 to "commercial truck driver" to "person"; (2) the trial court should delete "on December 30, 2014" in Question 3 and replace it with "at the time of the occurrence in question"; and (3) the question should refer to the "occurrence in question" rather than the "injuries in question."  We need not address whether the trial court erred in overruling any of these objections, because the trial evidence is legally and factually sufficient to support a finding that Ali's negligence was a proximate cause of either the occurrence in question or the injuries in question, regardless of whether the trial court erred in overruling either of the first two objections.

19

emphasized the need for the complaining party to make a timely and specific objection to preserve complaints of error in broad-form submission."). A party must "clearly designate the alleged error and specifically explain the basis of its complaint in its objection to the charge." *Koukhtiev v. Hiner*, No. 01-13-00356-CV, 2014 WL 4952430, at *3 (Tex. App.—Houston [1st Dist.] Oct. 2, 2014, no pet.) (mem. op.) (quoting *Hamid v. Lexus*, 369 S.W.3d 291, 296 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404-05 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd))). "The trial court is sufficiently aware of the complaint if the objection clearly designates the alleged error and specifically explains the basis for the complaint such that a reviewing court may conclude the trial court understood the ground of the complaint and deliberately chose to overrule it." *Lawrence Marshall Dealerships v. Meltzer*, No. 14-10-00189-CV, 2011 WL 2650940, at *3 (Tex. App.—Houston [14th Dist.] July 7, 2011, no pet.) (mem. op.). "Objections to the charge and requests for instructions must comport with the arguments made on appeal." *Saenz-Guerrero v. Gardner*, 587 S.W.3d 191, 194 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *Hamid,* 369 S.W.3d at 296.

Here, Appellants did not specify any invalid theory that was commingled with a valid theory; instead, they simply objected to submitting Questions 1 and 2 in broad-form, arguing such a submission "is a *Casteel* problem" because (1) both questions submit Werner's negligence without specifying which acts or omissions allegedly constituted negligence; (2) both questions generally combine valid and invalid theories; (3) Appellees alleged numerous possible actions by Werner that they assert may constitute negligence; and (4) it is impossible to tell from the jury's affirmative answer which of Werner's acts or omissions constituted negligence, thereby making it impossible to challenge the sufficiency of the evidence and

preventing the appeals court from determining the acts or omissions on which the jury based an affirmative finding. This objection, however, was insufficiently specific to place the trial court on notice as to which legal theories should have been subject to a granulated jury charge. *See Burbage*, 447 S.W.3d at 256; *Thota*, 366 S.W.3d at 691; *In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003) (holding *Casteel* complaint not preserved because objection did not "put [the] trial court on notice to submit a granulated question"); *Casteel*, 22 S.W.3d at 387-88; *Martinez v. State Off. of Risk Mgmt.*, No. 04-10-00046-CV, 2011 WL 193468, at *2 (Tex. App.—San Antonio Jan. 19, 2011, no pet.) (mem. op.).[6] Additionally, Appellants' "objection

---

[6] *Compare Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 157 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Duradril and Ward did not make a timely, specific objection to the broad-form submission of the applicable jury questions (1, 2, and 6) on the ground that they contained an invalid theory, *e.g.*, Dcan's lack of capacity to bring suit.") and *Tesfa v. Stewart*, 135 S.W.3d 272, 275-276 (Tex. App.—Fort Worth 2004, pet. denied) ("Appellants did not object in any respect to the form of the damages question, did not contend that some proper element of damages was improperly comingled in a list with a damage element supported by no evidence, and did not plainly inform the trial court that any specific element of damages — as opposed to every element of damages — should not be included in the broad-form submission.") *with Roberts v. Whitfill*, 191 S.W.3d 348, 357 (Tex. App.—Waco 2006, no pet.) ("Roberts did object, stating that there should be separate damage questions for the antitrust claim and for the fraud and breach of fiduciary duty claim because lost profits were recoverable only on the antitrust claim and other damages might be recoverable under any of the three claims."); *accord Murphy v. Am. Rice, Inc.*, No. 01-03-01357-CV, 2007 WL 766016, at *14 (Tex. App.—Houston [1st Dist.] Mar. 9, 2007, no pet.) (mem. op.) (counsel's objection "was not a specific objection that the trial court not submit specific jury questions because (1) the Delaware-incorporated ARI had no standing to assert the Texas-incorporated ARI's pre-bankruptcy claims, which had allegedly been assigned to the indenture trustee, or (2) ARI had no "standing" (or capacity) to sue for conversion of RCH's property or funds. Murphy's oral statements do not reveal, for example, to which jury questions he objected or to what aspects of each cause of action reflected in those questions he objected."). *Cf. Barnhart v. Morales*, 459 S.W.3d 733, 748 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (specificity within the context of *Casteel* objections to broad-form questions concerning damages must place the trial court on notice "that the element of future mental anguish damages should not be submitted in a single broad-form submission along with future physical evidence"); *Simmons v. Bisland,* No. 03-08-00141-CV, 2009 WL 961522, at *8 (Tex. App.—Austin Apr. 9, 2009, pet. denied) ("Simmons and Lindig argue on appeal that there is no evidence to support an award for mental anguish, but did not object to the inclusion of this element of damages in the broad-form question before it was read to the jury and therefore waived any legal sufficiency challenge regarding mental anguish."); *Tesfa*, 135 S.W.3d at 276 ("Additionally,

neither mentioned the specific problem [they] complain[ ] about on appeal . . . nor urged the solution [they] now claim[ ] to require[ ]." *Bishop v. Miller*, 412 S.W.3d 758, 782 (Tex. App.—Houston [14th Dist.] 2013, no pet.).  As a result, Appellants' complaints under *Casteel* with respect to Questions 1 and 2 were not properly preserved.  Tex. R. Civ. P. 274; *Burbage*, 447 S.W.3d at 256 (quoting Tex. R. App. P. 33.1); *Thota*, 366 S.W.3d at 691; *Saenz-Guerrero*, 587 S.W.3d at 194; *Bishop*, 412 S.W.3d at 782; *Hamid,* 369 S.W.3d at 296; *Lawrence Marshall Dealerships*, 2011 WL 2650940, at *3.

Similarly, Appellants also objected that Question 3 presented "a *Casteel* problem" because (1) the parties would not know the conduct on which the jury found negligence; (2) the question is "asking about the entire day"; and (3) the question "combines potentially valid legal theories with definitely invalid legal theories that have not been recognized as causes of action by the Texas Supreme Court."  Appellants also objected to the submission of Question 5 and argued there was a "*Casteel* problem" because (1) the jury would be permitted to "consider valid and invalid legal theories for which the defendants owe no duty as well as for which there's no evidence to support any finding of liability"; and (2) the parties would not know the evidence on which the jury's affirmative answers were based.  Again, these objections were insufficiently specific to inform the trial court as to which theories should have been presented in a granulated jury charge.  *In re A.V.*, 113 S.W.3d at 363; *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 157 (Tex.

Appellants' no-evidence objections to every element of damages obscured the complaint they now make:  that special question number 3 improperly comingled some valid damage elements with an improperly submitted disfigurement element of damages.") (citing *Davis v. Sheerin*, 754 S.W.2d 375, 385 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (holding charge objection of "no evidence, insufficient evidence, no predicate, comment on the evidence" did not preserve appellant's comment-on-the-weight-of-the-evidence complaint because appellant failed to explain how question constituted comment on the evidence and only included this among other stock objections)).

App.—Houston [14th Dist.] 2017, no pet.); *Roberts v. Whitfill*, 191 S.W.3d 348, 357 (Tex. App.—Waco 2006, no pet.); *see also Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex. 1984) (explaining Texas progressed from separate, granulated charge issues to the broad-form charge because "after sixty years, it became apparent that Texas courts, while escaping from the voluminous instructions to jurors, had substituted, in the place of instructions, a jury system that was overloaded with granular issues to the point that jury trials were again ineffective.").[7]  As a result, Appellants' complaints under *Casteel* with respect to Questions 3 and 5 were not properly preserved.  *See* Tex. R. Civ. P. 274; *Burbage*, 447 S.W.3d at 256 (quoting Tex. R. App. P. 33.1); *Thota*, 366 S.W.3d at 691; *Saenz-Guerrero*, 587 S.W.3d at 194; *Hamid,* 369 S.W.3d at 296; *Lawrence Marshall Dealerships*, 2011 WL 2650940, at *3.

Appellants neither objected to Question 6 based on *Casteel* nor made any arguments that could be liberally construed as raising a *Casteel* complaint. Therefore, Appellants waived any *Casteel* complaint concerning Question 6.  *See* Tex. R. App. P. 33.1.

Finally, Appellants objected to the submission of Question 7, asserting that "asking the jury to consider all of the conduct of Mr. Ali" on the day of the collision would create *Casteel* problems because the question would include "conduct for which the Supreme Court [of Texas] has not established any duty exists and in which were not and could not have been proximately caused of either the occurrence, which

---

[7] *Cf. Thota*, 366 S.W.3d at 689 (citing William G. "Bud" Arnot, III & David Fowler Johnson, *Current Trends in Texas Charge Practice: Preservation of Error and Broad–Form Use,* 38 St. Mary's L.J. 371, 416-40 (2007) (detailing history of Texas jury charge practices); William L. Davis, *Tools of Submission: The Weakening Broad–Form "Mandate" in Texas and the Roles of Jury and Judge,* 24 Rev. Litig. 57 (2005) (same)).

is the collision later in that day, or the injuries." Similar to Questions 1 through 3 and 5, this objection fails to identify the specific issues that should have been submitted to the jury in granulated questions and does not preserve this issue for appeal. *In re A.V.*, 113 S.W.3d at 363; *Saenz-Guerrero*, 587 S.W.3d at 194; *Duradril, L.L.C.*, 516 S.W.3d at 157; *Hamid,* 369 S.W.3d at 296; *Lawrence Marshall Dealerships*, 2011 WL 2650940, at *3; *Roberts*, 191 S.W.3d at 357.

We conclude Appellants have not preserved their *Casteel* complaints. *See Benge v. Williams*, 548 S.W.3d 466, 475 (Tex. 2018); *Tex. Comm'n on Human Rights v. Morrison*, 381 S.W.3d 533, 535-37 (Tex. 2012) (per curiam).

## B.     Omitted Element

We next turn to Appellants' argument that it was reversible error to ask the jury in Questions 1 through 4[8] to determine whether Werner, Ali, and Salinas proximately caused the Blakes' injuries (and in Questions 5 through 7 to assign responsibility to those who caused or contributed to said injuries) instead of asking whether they proximately caused the occurrence in question. Appellants argue that finding Werner, Ali, and Salinas proximately caused the occurrence is a necessary element of the Blakes' negligence claims, and the failure to secure a finding on each element of the Blakes' negligence claims requires the rendition of a take-nothing judgment in favor of Appellants or a new trial. We disagree.

Texas Rule of Civil Procedure 278 requires the trial court to submit requested questions to the jury if those questions are supported by the pleadings and the evidence. *Saenz-Guerrero*, 587 S.W.3d at 195; *see also* Tex. R. Civ. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). Otherwise, the trial court has broad discretion in submitting jury questions so long as the charge fairly places the

---

[8] Question 4 asked: "Was the negligence, if any, of Shiraz Ali in the operation of the Werner truck on December 30, 2014, a proximate cause of the injuries in question?"

24

disputed issues before the jury. *Saenz-Guerrero*, 587 S.W.3d at 195. The trial court abuses this discretion only when it acts without reference to any guiding principle. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Saenz-Guerrero*, 587 S.W.3d at 195. To prevail on a negligence cause of action, a plaintiff must establish the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017); *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

Appellants contend that "it was incumbent on [the Blakes] to obtain findings that Appellants' negligence caused this accident to support their claims." In support of their contention, Appellants quote *JLG Trucking, LLC v. Garza* for the proposition that: "Establishing causation in a personal injury case requires a plaintiff to 'prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries.'" 466 S.W.3d 157, 162 (Tex. 2015) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497 (Tex. 1995)). However, the supreme court has never held that a plaintiff must secure a specific finding that a defendant's conduct caused the collision and that the collision caused the plaintiff's injuries. *See id*. In fact, *JLG Trucking* neither addressed an omitted element issue nor involved a jury charge issue; therefore, it is readily distinguished. *See id*. at 159-66.

Instead, the question addressed was whether the trial court erroneously excluded evidence on relevance grounds. *Id*. at 161-63. There, the plaintiff was involved in two car collisions a few months apart. *Id*. at 159. After the second one, the plaintiff sued the opposing driver in the first and alleged that it caused her injuries. *Id*. The defendant sought to present two alternative defensive theories: (1) the defendant presented expert testimony that the plaintiff's injuries were degenerative and not related to the collision and (2) the defendant claimed the second

collision caused her injuries. *Id*. The trial court excluded all evidence of the second collision on relevance grounds. *Id*. The supreme court held that the trial court abused its discretion by excluding evidence of the second accident as irrelevant. *Id*. at 162-63. It determined "that evidence of the second accident is relevant to the causation element of [the plaintiff]'s negligence claim." *Id*. at 162. The Supreme Court of Texas concluded that the exclusion of the second collision curtailed the defendant's ability to probe the plaintiff's expert's conclusions about causation by asking him to explain why he discounted the second collision as an alternative cause. *Id*. at 162-63. We conclude that *JLG Trucking* provides no support for Appellants' argument.

## C. Injury versus Occurrence

We also conclude that the proportionate responsibility statute set forth in chapter 33 of the Civil Practice and Remedies Code supports the submission of the jury questions using the word "injuries" instead of "the occurrence in question." The plain language of chapter 33 provides that the factfinder must apportion responsibility between persons who contributed to a harm for which a recovery is sought:

> The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these: (1) each claimant; (2) each defendant; (3) each settling person; and (4) each responsible third party who has been designated under Section 33.004.

Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). Section 33.011(4) directs the factfinder to assign responsibility to each person who in any way causes (or contributes to cause) personal injury or death. *See id*. § 33.011(4); *Nabors Well*

26

*Servs., Ltd.*, 456 S.W.3d at 561-62. As the supreme court stated in *Nabors*, "sections 33.003(a) and 33.011(4) focus the fact-finder on assigning responsibility for the 'harm for which recovery of damages is sought' — two examples of which are 'personal injury' and 'death' — and not strictly for the underlying occurrence, such as a car accident." *Nabors*, 456 S.W.3d at 562 (quoting Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003(a), 33.011(4)). "This distinction recognizes plaintiffs do not sue simply because they were involved in a car accident; they sue because they suffered damages for which they have not been compensated." *Id.*

The supreme court noted that although the facts of an occurrence shape the narrative of the case and contribute to the factfinder's apportionment of responsibility, the proportionate-responsibility statute specifies that the apportionment should ultimately be based on responsibility for the damages suffered — personal injury and death; so "the question is not simply who caused the car accident, but who caused the plaintiff's injuries." *Id.* The court reasoned that the "proportionate-responsibility statute calls for an apportionment of fault for 'personal injuries' and 'death' rather than for the underlying occurrence that introduced a sequence of events in which the end result is potentially influenced" by whether a plaintiff, defendant, settling person, or responsible third party acted unreasonably or broke the law. *Id.* at 563. Although the *Nabors* case involved plaintiffs' non-occurrence-causing but injury-causing conduct (failure to wear a seatbelt) under the proportionate-responsibility statute, nothing in *Nabors* limits the supreme court's holding to situations in which a plaintiff's conduct caused the injury but did not cause the occurrence. As in *Nabors*, the present case involves proportionate responsibility questions.

Additionally, the comment to the Texas Pattern Jury Charge on negligence provides no support for Appellants' contention that Jury Questions 1 through 4

should have asked the jury to determine whether Werner, Ali, and Salinas proximately caused Appellees' injuries (and Questions 5 through 7 to assign responsibility to those who caused or contributed to cause the injuries) instead of asking whether they proximately caused the occurrence in question. The comment regarding the use of "injury" or "occurrence" provides in pertinent part:

> "Injury" should be used in this question, as well as in PJC 4.3, if the issue of the responsibility of more than one person is submitted to the jury under the proportionate responsibility statute, Tex. Civ. Prac. & Rem. Code §§ 33.001-.017. For suits filed after September 1, 1987, section 33.003 requires a finding of "percentage of responsibility" in pure negligence cases as well as in "mixed" cases involving claims of negligence and strict liability and/or warranty. The statute defines "percentage of responsibility" in terms of "causing or contributing to cause in any way . . . the personal *injury*, property damage, death, or other harm for which recovery of damages is sought." Tex. Civ. Prac. & Rem. Code § 33.011(4) (emphasis added); *Nabors Well Services, Ltd. v. Romero*, 456 S.W.3d 553, 563 (Tex. 2015) (holding that the proportionate responsibility statute requires fact finders to consider relevant evidence of a plaintiff's preoccurrence, injury-causing conduct, overruling prior case law prohibiting evidence of plaintiff's failure to wear a seatbelt).

> In cases with no allegations of injury-causing negligence by a plaintiff, it may be appropriate to use "occurrence" in this question and in PJC 4.3. However, the concerns expressed in *Nabors* should be considered carefully.

> In a case involving a death, the word "death" may be used instead of "injury."

Comm. On Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 4.1, at 54-55 (2016) (emphasis in original).

The proportionate-responsibility statute therefore requires an apportionment of fault for personal injuries. Although cases without allegations of injury-causing negligence may warrant the use of "occurrence" (instead of "injury") in a jury

28

question, there is no such instruction. Instead, the comment advises careful consideration of *Nabors* (which does not limit the use of the word "injury" or "injuries" in a charge question to situations in which a plaintiff's conduct was injury-causing but not occurrence-causing). Accordingly, we overrule Appellants' challenge to the use of "injuries" in the submitted jury questions.

### D.   Sudden Emergency Instruction

Appellants contend the trial court abused its discretion by refusing to submit a sudden emergency instruction in the jury charge and that this omission probably caused the jury to render an improper verdict. Appellants argue the jury erroneously "was not told it could entirely absolve Ali of liability if it found that, after the emergency caused by Salinas's conduct arose, Ali acted as a person of ordinary prudence would have under those circumstances." The trial court refused to submit the following proposed sudden emergency instruction:

> If a person is confronted by an "emergency" arising suddenly and unexpectedly, which was not proximately caused by any negligence on his part and which, to a reasonable person, requires immediate action without time for deliberation, his conduct in such an emergency is not negligence or failure to use ordinary care if, after such emergency arises, he acts as a person of ordinary prudence would have acted under the same or similar circumstances.

The trial court, however, agreed to submit an unavoidable accident instruction in the charge stating: "An occurrence may be an 'unavoidable accident,' that is, an event not proximately caused by the negligence of any party to the occurrence."

A trial court is required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). A trial court has "great latitude and

29

considerable discretion" to determine necessary and proper jury instructions. *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998) (per curiam). When a trial court refuses to submit a requested instruction, the issue on appeal is whether the instruction was reasonably necessary to enable the jury to render a proper verdict. *Oldham v. Thomas*, 864 S.W.2d 121, 126 (Tex. App.—Houston [14th Dist.] 1993), *rev'd in part on other grounds*, 895 S.W.2d 352 (Tex. 1995).

Appellate courts review claims of charge error for an abuse of discretion. *See Hawley*, 284 S.W.3d at 856. A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)); *see also Hawley*, 284 S.W.3d at 856. A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented appellants from properly presenting the case to the court of appeals. *Hawley*, 284 S.W.3d at 856; *see also* Tex. R. App. P. 44.1(a).

Appellants assert that the trial court abused its discretion when it refused to submit an instruction on their inferential rebuttal defense of sudden emergency. Inferential rebuttal defenses operate to rebut an essential element of the plaintiff's case via other facts. *See Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 430, 432 (Tex. 2005). When a defendant blames an occurrence on someone or something other than himself, the Texas Pattern Jury Charges provide multiple alternatives for inferential rebuttal instructions. *Id.* at 432. Among them is an unavoidable accident instruction if the occurrence is not caused by the negligence of any party to the occurrence; there is also a sudden emergency instruction if the occurrence (1) is caused by something other than the defendant's negligence and (2) arises suddenly and unexpectedly. *See id.* The purpose of these instructions is to advise the jury

30

that it does not have to place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question or that the conduct of some person not a party to the litigation caused it. *Id.*

Although the trial court submitted an unavoidable accident instruction, Appellants argue that they were entitled to a separate instruction on their sudden emergency inferential rebuttal defense because there is evidence the accident was caused by an emergency. For an instruction on sudden emergency to be proper, the evidence must support the necessary elements of the sudden emergency defense, namely, that (1) an emergency arose suddenly and unexpectedly; (2) the emergency was not proximately caused by the negligent act or omission of the person whose conduct is under inquiry; and (3) the conduct (which would constitute negligence under ordinary circumstances) must have occurred after the emergency arose without giving the person time to deliberate. *See Oldham*, 864 S.W.2d at 126; *see also Jordan v. Sava, Inc.*, 222 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Here, the negligent acts and omissions of Appellants are under inquiry; therefore, Appellants were not entitled to a sudden emergency inferential rebuttal and the trial court did not abuse its discretion when it refused to provide one.

Assuming *arguendo* that there is some evidence to support the necessary elements of the sudden emergency defense, we nonetheless conclude that any alleged error in not submitting this inferential rebuttal defense was harmless. As we have stated, the trial court submitted an instruction on the unavoidable accident inferential rebuttal defense. The doctrine of sudden emergency is subsumed by the broader doctrine of unavoidable accident. *Reinhart v. Young*, 906 S.W.2d 471, 474 (Tex. 1995); *Gregory v. Chohan*, 615 S.W.3d 277, 300 (Tex. App.—Dallas 2020, pet. granted). Further, a sudden emergency instruction "reiterates much of the unavoidable accident instruction." *Reinhart*, 906 S.W.2d at 474. Having reviewed

31

the record, we conclude the trial court's refusal to submit Appellants' proposed sudden emergency instruction did not amount to such a denial of their rights as to have caused the rendition of an improper judgment. Accordingly, we overrule Appellants' complaint that the trial court improperly refused the sudden emergency instruction and overrule Appellants' second issue with regard to the jury charge.

## E.    Objections to Question 3

At the charge conference, the trial court overruled various objections by Appellants to Question 3, including the following: (1) the trial court should change each reference in Question 3 from "commercial truck driver" to "person"; and (2) the trial court should delete "on December 30, 2014" in Question 3 and replace it with "at the time of the occurrence in question." We need not address whether the trial court erred in overruling either of these objections because (as stated above) the trial evidence is legally and factually sufficient to support a finding that Ali breached his negligence duty regardless of whether the trial court erred in overruling either of these objections. *See* Tex. R. App. P. 47.1.

We overrule Appellants' second issue.

## III.   Werner's Negligence

In their third issue, Appellants make several arguments. They contend that (1) Texas does not recognize direct liability claims against employers who admit respondeat superior liability; (2) Werner does not owe the duties claimed by the Blakes; (3) there is insufficient evidence to support a finding that Werner breached any duty it may have owed to the Blakes; and (4) there is insufficient evidence to support a finding that Werner's actions were the proximate cause of the accident.

32

**A.** **The "respondeat superior admission rule" has not been recognized in this District and even if it had been, Appellees' gross negligence claims preclude its application.**

We begin by addressing Werner's contention that (1) it is not liable for any asserted direct liability claims because it stipulated at trial that it was liable under a theory of respondeat superior, and (2) "there is no legal reason to allow" Texas plaintiffs to proceed with both direct liability claims and respondeat superior claims against an employer. At the trial court, Werner moved for directed verdict based (in relevant part) upon the alleged absence of evidence capable of supporting "the submission in this case of a direct liability claim against Werner because here the fact that Mr. Ali was in the course and scope of his employment as a driver for Werner is not disputed." Despite asking this Court to reverse the trial court's over $100 million judgment based on the so-called "respondeat superior admission rule" (which was not in effect in this District at the time of the trial court's ruling), Werner materially misstates the applicable law.

> Under this [*respondeat superior* admission] rule, courts dismiss direct negligence claims (like Plaintiff's claims for negligent hiring, retention, supervision, and control) before they reach the jury **if "no viable gross negligence claims remain** and the defendant employer does not dispute the applicability of vicarious liability."

*Cristo v. C.R. England, Inc.*, No. 5:18-CV-1344-DAE, 2021 WL 801340, at *4 (W.D. Tex. Jan. 7, 2021) (emphasis added) (quoting *Ochoa v. Mercer Transp. Co.*, No. 5:17-CV-1005-OLG, 2018 WL 7505640, at *3 (W.D. Tex. Dec. 10, 2018)); *accord Sanchez v. Transportes Internacionales Tamaulipecos S.A de C.V.*, No. 7:16-CV-354, 2017 WL 3671089, at *2 (S.D. Tex. July 20, 2017) ("[C]ase law . . . instructs that where a plaintiff alleges ordinary (rather than gross) negligence, and the employer stipulates to its vicarious liability for its employee's negligence, a respondeat superior claim and the type of direct negligence claims asserted here are

33

'mutually exclusive' means of recovering from the employer.") (emphasis added); *Arrington's Estate v. Fields*, 578 S.W.2d 173, 178-79 (Tex. App.—Tyler 1979, writ ref'd n.r.e.) ("The owner of a vehicle, charged with gross negligence in the entrustment of a vehicle, may not preclude proof thereof by admitting or stipulating agency on the part of the driver or that the driver was within the course and scope of employment."); *Hines v. Nelson*, 547 S.W.2d 378, 385 (Tex. App.—Tyler 1977, no writ) ("In cases involving allegations of ordinary negligence against the driver and gross negligence against the owner for entrusting his vehicle to a reckless or incompetent driver, we feel there would be a separate ground for damages against the owner in the form of exemplary damages.").[9] Werner's brief even cites to a case that directly contradicts its assertion that there is "no legal reason to allow both claims to proceed." *See Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 654 (Tex. App.—Dallas 2002, pet. denied) ("Where only ordinary negligence is alleged, the case law supports appellees' contention that negligent hiring or negligent entrustment and respondeat superior are mutually exclusive modes of recovery . . . . Where the plaintiff has alleged ordinary negligence against the driver *and gross negligence against the owner* for entrusting his vehicle to a reckless or incompetent driver, the negligent entrustment cause of action would be an independent and separate ground of recovery against the owner *for exemplary damages* . . . . West

---

[9] *Cf. Dieter v. Baker Serv. Tools, A Div. of Baker Int'l Inc.*, 739 S.W.2d 405, 408 (Tex. App.—Corpus Christi 1987, writ denied) ("While the issue has not been directly addressed by a Texas court, we hold that liability for negligent hiring and supervision is not dependent upon a finding that the employee was acting in the course and scope of his employment when the tortious act occurred. *See generally Salinas v. Fort Worth Cab & Baggage Co.,* 725 S.W.2d 701 (Tex. 1987); *see e.g. Plains Res., Inc. v. Gable,* 235 Kan. 580, 682 P.2d 653 (1984); *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436 (R.I.1984); *Gregor v. Kleiser,* 111 Ill. App. 3d 333, 67 Ill. Dec. 38, 443 N.E.2d 1162 (1982). If course and scope was a required element of a negligent hiring and supervision claim, negligent hiring and supervision as a unique cause of action would be rendered superfluous by the *respondeat superior* doctrine.").

stipulated that Rieve was acting within the scope of his employment. Accordingly, Central West's liability for ordinary negligence was established under the doctrine of respondeat superior. However, *the Rosells alleged gross negligence* against Central West, entitling them to questions concerning Central West's negligent entrustment, hiring, supervision, and retention.") (emphases added).

Here, the Blakes alleged that Werner was liable based upon (*inter alia*) a theory of gross negligence; such allegations entitle Texas plaintiffs to seek exemplary damages, a theory that was presented to the jury. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(3). Under the circumstances, the Blakes' gross negligence claim was viable at all relevant times even if it was ultimately rejected by the jury (and Werner failed to contend otherwise on appeal).[10] As a result, this "rule" would not apply even if we chose to adopt it and apply it retroactively without prior notice to litigants. Under the circumstances, this result maintains the uniformity of this court's jurisprudence. *See Adams Leasing Co. v. Knighton*, 456 S.W.2d 574, 576 (Tex. App.—Houston [14th Dist.] 1970, no writ) ("Nor may a defendant charged with gross negligence in the entrustment of a vehicle preclude proof thereof by *stipulating* agency on the part of the person to whom such vehicle is entrusted."); *see also* Tex. R. App. P. 41.2(c) (authorizing en banc consideration "to secure or maintain uniformity of the court's decisions").

Despite the absence of any such argument in Appellants' briefs, our dissenting

---

[10] Our dissenting colleague, Justice Wilson, nonetheless insists that "the gross negligence issue must not be presented to a jury if there is legally insufficient evidence of gross negligence at trial and the defendant moves for a directed verdict on that ground, as happened in today's case." *See post* at 34 (Wilson, J., en banc dissenting opinion). However, Werner's briefs do not address gross negligence or the legal sufficiency of the evidence in support thereof. In fact, Werner's briefs do not even contain the words "gross negligence". "Reaching this issue is not judicial liberal construction. It is judicial advocacy." *Reule v. M & T Mortg.*, 483 S.W.3d 600, 619 n.12 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

35

colleague, Justice Wilson, insists that we must hold "the trial court reversibly erred in denying Werner's motion for directed verdict" based on the so-called "respondeat superior admission rule". *Werner Enterprises, Inc. v. Blake*, No. 14-18-00967-CV, 2021 WL 3164005, at *13 (Tex. App.—Houston [14th Dist.] July 27, 2021, no pet.) (Wilson, J., dissenting). This conclusion evidences a fundamental misunderstanding concerning directed verdicts and our standard of review on appeal. *See Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 387 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A directed verdict is appropriate when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment.") (citing *Tanglewood Homes Ass'n Inc. v. Feldman*, 436 S.W.3d 48, 66 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)); *see also Weidner v. Sanchez*, 14 S.W.3d 353, 366 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("We review the denial of a motion for a directed verdict by a legal sufficiency or no evidence standard of review.") (citing *McFarland v. Sanders*, 932 S.W.2d 640, 643 (Tex. App.—Tyler 1996, no writ)).

When reviewing a 'no evidence' point of error, we consider only the evidence and inferences that support the challenged finding and disregard all evidence and inferences to the contrary. *See Weidner*, 14 S.W.3d at 373 (citing *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)). A no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Remaley v. TA Operating LLC*, 561 S.W.3d 675, 678 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). None of these standards are met under the facts of this

case; instead, Justice Wilson insists we must overturn the jury's verdict based on the trial court's implicitly erroneous admission of evidence that tended to prove the Blakes' allegations concerning gross negligence and negligent supervision. There is no precedent supporting Justice Wilson's analysis precisely because it is not the law.

Evidentiary rulings such as the one at issue are committed to the trial court's sound discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). The well-established test for abuse of discretion is "whether the court acted without reference to any guiding rules and principles." *In re Nat'l Lloyds Ins. Co.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam) (citing *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985))); *Clear Lake City Water Auth. v. Salazar*, 781 S.W.2d 347, 348-49 (Tex. App.—Houston [14th Dist.] 1989, orig. proceeding) (citing *Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124, 126 (Tex. Comm. App. 1939, opinion adopted)). Neither Werner nor Justice Wilson cite any precedent for the proposition that a trial court can abuse its discretion by admitting evidence contrary to a judicially created "rule" that was not adopted in the relevant jurisdiction at the time of trial. Without such a "rule" in effect, the trial court did not act "without reference to any guiding rules and principles" when it admitted evidence that tended to prove the Blakes' allegations. *See K-Mart Corp.*, 24 S.W.3d at 360.

Therefore, Justice Wilson's conclusion that the trial court erred when it denied Werner's motion for directed verdict is correct only if (1) the facts are legally insufficient to support the Blakes' derivative claims or (2) there is no evidence supporting those claims. *See Weidner*, 14 S.W.3d at 373; *see also Caver v. Clayton*, No. 14-18-00160-CV, 2021 WL 629802, at *2 (Tex. App.—Houston [14th Dist.]

37

Feb. 18, 2021, no pet.) ("In appealing the denial of a motion for directed verdict and a motion for judgment notwithstanding the verdict, Son-in-Law in effect challenges the legal sufficiency of the evidence.") (citing *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 265 (Tex. App.—Houston [14th Dist.] 2002, pet. denied)); and *id.* ("The test for legal sufficiency is the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.") (citing *City of Keller*, 168 S.W.3d at 823). Based on our conclusion that the Blakes' evidence is legally sufficient to support the jury's verdict, we reject Justice Wilson's attempt to rewrite our clearly established jurisprudence concerning appellate review of denied directed verdicts.

B.    **The Blakes' prevail on their direct liability claims.**

After rejecting the retroactive applicability of the "respondeat superior admission rule", we next consider Appellants' assertion that the Blakes' direct liability theories submitted in Questions 1 and 2 against Werner fail because (1) Werner did not owe the Blakes a duty; (2) Werner did not breach a duty it may have owed the Blakes; and (3) Werner's actions did not proximately cause the accident. In their various complaints, Appellants challenge the legal and factual sufficiency of the evidence, which we review as follows.

When reviewing a challenge to the legal sufficiency of the evidence, we view *the evidence presented at trial* in the light most favorable to the verdict and indulge every reasonable inference therefrom in the verdict's favor. *See City of Keller*, 168 S.W.3d at 822 (emphasis added); *see also Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). We credit evidence in support of the judgment if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not do so. *City of Keller*, 168 S.W.3d at 822; *Small*, 352 S.W.3d at 283. If the evidence falls within the zone of reasonable disagreement,

we will not substitute our judgment for the factfinder's. *City of Keller*, 168 S.W.3d at 822. Simply stated, we analyze whether the evidence at trial would have enabled reasonable and fair-minded people to reach the verdict that is under review. *Id.* at 827. "If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges merely go the weight of the evidence." *Weidner*, 14 S.W.3d at 373 (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993)). "There is some evidence when the proof supplies a reasonable basis upon which reasonable minds could reach different conclusions about the existence of a vital fact." *Id.* (citing *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992) (per curiam)).

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp.*, 971 S.W.2d at 406-07. After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Pascouet*, 61 S.W.3d at 615-16. We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp.*, 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

### 1. Negligence Liability Finding in Question 1

We begin by addressing Appellants' arguments assailing the jury's negligence finding in Question 1, which provided as follows:

Question 1

Was the negligence, if any, of Werner acting through its

39

employees other than Shiraz Ali a proximate cause of the injuries in question?

> In answering this question, do not consider Werner's negligence, if any, in training or supervising Shiraz Ali[.]
>
> "Negligence," when used with respect to the conduct of Werner, means failure to use ordinary care, that is, failing to do that which a trucking company of ordinary prudence would have done under the same or similar circumstances or doing that which a trucking company of ordinary prudence would not have done under the same or similar circumstances[.]
>
> "Ordinary care," when used with respect to the conduct of Werner, means that degree of care that would be used by a trucking company of ordinary prudence under the same or similar circumstances[.]
>
> "Proximate cause," when used with respect to the conduct of Werner, means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred[.]  In order to be a proximate cause, the act or omission complained of must be such that a trucking company using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom[.]  There may be more than one proximate cause of an injury.
>
> Answer "yes" or "no"

### a.    Duty

Appellants first contend that the jury's liability finding against Werner cannot stand because it did not owe the Blakes a duty.  The threshold inquiry in a negligence case is duty, and the existence of duty is a question of law the court determines from the facts surrounding the occurrence in question.  *Pagayon*, 536 S.W.3d at 503; *see Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999) ("Whether a legal duty exists is a threshold question of law for the court to decide from the facts surrounding the occurrence in question.").  When a duty has not been recognized in particular circumstances, the question is whether one should be recognized.  *Pagayon*, 536 S.W.3d at 503.  We must therefore determine whether Werner owed the Blakes a

40

duty. *See Southcross Energy Partners GP, LLC v. Gonzalez*, 625 S.W.3d 869, 876 (Tex. App.—San Antonio 2021, no pet.) ("When courts have not yet addressed whether a duty exists under the facts surrounding the occurrence in question, courts must address whether a duty should be recognized by weighing public policy considerations.").

The supreme court has made clear that special relationships "sometimes give rise to a duty to aid or protect others" and that "[e]mployment is such a relationship." *Pagayon*, 536 S.W.3d at 504. There is no dispute that Ali was employed and trained by Werner. Therefore, we proceed to analyze whether Werner owed the Blakes a duty via the risk-utility test. *See generally HNMC, Inc. v. Chan*, 637 S.W.3d 919, 930 (Tex. App.—Houston [14th Dist.] 2021, pet. filed) (en banc) (citing *Pagayon*, 536 S.W.3d at 503-04; *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) ("[F]actors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer.")); *see also Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998) (identifying the factors of the risk-utility test).

### i.    Risk

Under the circumstances, the risk was astonishingly high that a newly trained 18-wheeler driver who was not trained to drive in winter weather would cause serious death or injury if confronted with a traffic scenario requiring quick reactions while travelling at approximately 50 miles per hour on a Texas highway with black ice, freezing rain, and freezing temperatures during a National Weather Service Winter Storm Warning, particularly when the driver (1) did not have (a) information from Werner regarding the conditions on his anticipated or known route, or

41

(b) access to readily acquirable devices that facilitated the detection of conditions giving rise to black ice (like a CB radio or OAT gauge); (2) was considered a student driver with the second-lowest possible evaluation score; and (3) was assigned a high-pressure JIT delivery. The jury also heard that (1) Ali concluded the road was not icy because there was no "spray coming from cars" and (2) Ali's method of detecting conditions giving rise to black ice was flawed because drivers "cannot look at spray coming off a tire when there has been freezing rain and there's been moisture in the air. There's going to be a small, thin layer on top of solid ice and it's even more slippery."

### ii. *Likelihood of Injury*

The record contains evidence that there was black ice on the roads, black ice is the "most dangerous . . . by far," black ice is "the most difficult to see" and "generally must be inferred from other evidence," black ice reduces traction and increases the likelihood of someone being seriously injured or killed in a motor vehicle collision (especially with an 18-wheeler), drivers of 18-wheelers will encounter traffic scenarios they did not create but that nonetheless require reasonable responsiveness, and (under the circumstances) it was likely that an 18-wheeler traveling at approximately 50 miles per hour in the freezing rain on black ice during a National Weather Service Winter Storm Warning would cause significant injury or death if presented with a traffic scenario that required an immediate reduction of speed to avoid a significant collision with another vehicle that lost control in those same conditions. Under the circumstances, the likelihood of serious bodily injury or death to travelers in vehicles that lost control in front of unreasonably unskilled 18-wheeler drivers while they are traveling at approximately 50 miles per hour through an area with a Winter Storm Warning, freezing rain, freezing temperatures, and black ice despite being deprived of information concerning those weather

42

conditions was extremely high.

### iii. Foreseeability

Foreseeability is, time and again, the single most important variable of the six. *See City of Waco v. Kirwan*, 298 S.W.3d 618, 624 (Tex. 2009); *see also Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002). Texas law has long recognized that "[f]orseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985) (citing *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977)); *see also Mo. Pac. R.R. Co.*, 552 S.W.2d at 103-04 ("An act wanting in ordinary care which actively aids in producing an injury as a direct and existing cause need not be the sole cause; but it must be a concurring cause and such as might reasonably have been contemplated as contributing to the result under the attending circumstances. It matters not what the actor believed would happen, but whether he ought to have reasonably foreseen that the event in question, or some similar event, would occur.") (citing, *inter alia, Gonzales v. City of Galveston*, 19 S.W. 284, 285 (Tex. 1892)). "Foreseeability does not require that the actor anticipate just how the injuries will grow out of the particular dangerous situation." *Mo. Pac. R.R. Co.*, 552 S.W.2d at 103 (citing *Clark v. Waggoner*, 452 S.W.2d 437 (Tex. 1970); *Hopson v. Gulf Oil Corp.*, 237 S.W.2d 352 (Tex. 1951)); *see also Finley v. U-Haul Co. of Ariz.*, 246 S.W.3d 185, 187 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Foreseeability requires only that the general danger, and not the exact sequence of events that produced the harm, be foreseeable.") (citing *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999)); *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

43

Here, Werner should have reasonably anticipated that it created unreasonable dangers for other travelers (including the Blakes) who were travelling in treacherous weather conditions by (1) failing to provide its drivers with instruments like a CB radio and an OAT gauge, (2) prohibiting the use of such instruments, and (3) failing to inform its drivers of possible weather hazards because its drivers (especially inexperienced novice drivers like Ali) would foreseeably fail to realize that they were driving their 18-wheelers at unreasonable speeds on roads with black ice, thereby preventing them from avoiding otherwise avoidable catastrophic collisions with travelers on Texas highways. Werner also should have reasonably anticipated that assigning student drivers with subpar evaluation scores to high-pressure JIT runs through areas with perilous weather conditions and imposing consequences for late deliveries (including termination for multiple late deliveries) created dangers for other travelers (including the Blakes) because drivers (like Ali) lacked the skill and experience to safely handle such runs in such conditions. Therefore, the harms to the Blakes were foreseeable under the circumstances. *See Palsgraf*, 162 N.E. at 100 ("The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension."); *see also Grewe v. Sw. Co.*, No. 04-3818JRTFLN, 2005 WL 1593048, at *3-4 (D. Minn. July 5, 2005) (citing *Palsgraf*, concluding the appellee owed a legal duty to the appellant, and holding the duty "arose out of the fact that [appellee] knew, or should have known that . . . arranging carpools for exhausted students that would require them to drive through the night . . . would result in a foreseeable risk of injury"); *Robertson v. LeMaster*, 301 S.E.2d 563, 568-69 (W. Va. 1983) (citing *Palsgraf*, concluding the appellee owed a legal duty to the appellants, and holding "the appellee reasonably could have foreseen that its exhausted employee, who had been required to work over 27 hours without rest, would pose a risk of harm to other motorists while driving the 50 miles from the appellee's office to his home").

The Supreme Court of Texas has recently reaffirmed long held precedent underpinning the inherently basic concept of foreseeability in negligence actions:

> Foreseeability does not necessarily equate to predictability. Rather, "foreseeability" means that the actor should have reasonably anticipated the dangers that his negligent conduct created for others. It does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence. It requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. Accordingly, the plaintiff need not always show that his particular injury has occurred before in order to create a fact question on foreseeability.

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019) (internal citations omitted). Under the facts of the record below, we conclude the injuries were of a general character that might reasonably have been anticipated considering that Werner (1) not only failed to provide its drivers with equipment that would enable them to recognize dangerous road conditions like ice, freezing rain, and black ice, but it prohibited the use of such equipment, and (2) assigned high-pressure JIT deliveries to inexperienced and unskilled student drivers. *See Mellon Mortg. Co.*, 5 S.W.3d at 655.

### iv.    Magnitude of Burden

Appellants fail to identify any burden Werner would incur if it took any affirmative steps to address the risk, foreseeability, and likelihood of injury under these facts. The closest Appellants come is a conclusory statement: in their view, this Court should not impose any new duties on motor carriers based on the "unjust, undue burden on interstate commerce that such duties would create." This singular statement neither briefs nor proves Werner's burden and fails to support any argument that such a burden is sizable (much less unjust). To the extent Appellants rely on this statement to show the magnitude of Werner's burden, they have waived

this issue via a failure to brief it.  *See* Tex. R. App. P. 38.1(f), (i), & (j).[11]

The second closest Appellants come to addressing the magnitude of Werner's burdens is when they argued (for the first time in their reply brief on appeal) that "the magnitude of requiring all commercial drivers to cease operation whenever ice may be present would be momentous[.]"  Even if we were to accept this contention as properly briefed, Appellants fail to cite *any* fact or authority tending to support their point; again, this constitutes briefing waiver.  *See* Tex. R. App. P. 38.1(i).[12] Additionally, we do not believe that it is too much to ask of Werner to require its drivers to refrain from driving unreasonably fast.  In fact, section 2.6.2 of the CDL

---

[11] *See also Reule v. M & T Mortg.*, 483 S.W.3d 600, 617 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *Goad v. Hancock Bank,* No. 14-13-00861-CV, 2015 WL 1640530, at *5 (Tex. App.—Houston [14th Dist.] Apr. 9, 2015, pet. denied) (mem. op.) (holding that a "passing argument" that contains no substantive argument, analysis, or citation to the record or relevant authorities constitutes briefing waiver)); *Cruz v. Cruz*, No. 14-19-00016-CV, 2019 WL 2942630, at *2 (Tex. App.—Houston [14th Dist.] July 9, 2019, no pet.) (mem. op.) (per curiam) ("Even construing Santiago's appellate brief liberally, we cannot conclude that he adequately briefed any argument in support of this assertion . . . .  Therefore, we find briefing waiver.") (citations omitted); *Slaughter v. Johnson*, No. 14-17-00050-CV, 2018 WL 4116115, at *5 (Tex. App.—Houston [14th Dist.] Aug. 28, 2018, no pet.) (mem. op.) ("When an appellant fails to make proper citations to authority or to the record or provide any substantive legal analysis, the issue is waived.") (citations omitted); *In re Estate of Gibbons*, 451 S.W.3d 115, 123 n.7 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[T]he Contestants have not provided any argument, analysis, or citations to the record or legal authority in support of [their] assertion.  Even construing the Contestants' brief liberally, we cannot conclude that they have adequately briefed any argument in support of this assertion.") (citing *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 337 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

[12] *See also Turner v. Ewing*, No. 14-18-01020-CV, 2020 WL 6878681, at *1 (Tex. App.—Houston [14th Dist.] Nov. 24, 2020, pet. denied) (noting that, "[a]s an appellate court, it is not our duty to perform an independent review" of the record for evidence supporting an appellant's position) (citing *Priddy v. Rawson*, 282 S.W.3d 588, 595 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Lundy v. Masson*, 260 S.W.3d 482, 503 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (concluding that appellant failed to provide argument or cite authority for contention on appeal and appellate court was "not required to do the job of the advocate")); *Guajardo v. Hitt*, 562 S.W.3d 768, 781 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *In re R.H.W. III*, 542 S.W.3d 724, 742 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Accordingly, we conclude that Father failed to adequately brief any argument in support of this issue, and so has waived the complaint.").

46

manual contains a safety rule requiring drivers to reduce their speed to a "crawl" (meaning a speed of no more than 15 mph) and then come to a stop as soon as feasible when they encounter icy roads. Considering section 2.6.2's safety rule, requiring drivers to slow or stop when encountering icy roads is neither "momentous" nor overly burdensome.

The third closest Appellants get to addressing the magnitude of Werner's burdens can be found on page 45 of their appellate brief. There, they say that "continuously monitoring thousands of weather conditions across the country that are constantly changing . . . [is] impossible for any company to meet" and that "[m]otor carriers simply cannot monitor real-time weather conditions for each truck route across the country and provide on-the-spot, minute-by-minute directives to their drivers. No court has imposed such duties." However, there is no record evidence supporting these conclusory statements. Therefore, it is waived. *See* Tex. R. App. P. 38.1(i) ("The brief must contain . . . appropriate citations to . . . the record."); *Harkins v. Dever Nursing Home*, 999 S.W.2d 571, 572-73 (Tex. App.— Houston [14th Dist.] 1999, no pet.); *see also Reule v. M & T Mortg.*, 483 S.W.3d 600, 619 n.12 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("Notwithstanding our discretion in the area of briefing waiver, we must balance the rights of the parties in this endeavor. For example, where a party fails to adequately brief in an opening brief, but takes steps to cure the inadequacy by supplemental authorities and citations, we may consider the issue because the opposing party *has an opportunity to respond* . . . . But here, neither the appellant nor the appellees have supplied any citations to the record or legal authority on the issue of sanctions.") (emphasis added) (citation omitted); *Wohlfarhrt v. Holloway*, 172 S.W.3d 630, 639 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("To have preserved error, a

party's argument on appeal must comport with its argument in the trial court.").[13] After a thorough examination of a lengthy record, we are satisfied that there was no evidence before the trial court concerning the purported magnitude of any burden relevant to our duty analysis under the risk-utility test.

Therefore, Appellants have failed to introduce any evidence tending to show the magnitude of the purported burden Werner would incur if it provided its new or inexperienced drivers with access to (1) information concerning dangerous weather conditions along their routes or potential routes (*e.g.*, Winter Storm Warnings from the National Weather Service); or (2) CB radios or OAT gauges to determine outside temperatures when even Werner's winter training module requires drivers to have their CB radios on (thereby providing foreseeable access to knowledge concerning the existence of the dangerous conditions foreseeably presented). Nor is there evidence showing what the purported burden on Werner would be to refrain from assigning JIT deliveries to low-scoring student drivers who require supervision but

---

[13] Our dissenting colleague, Chief Justice Christopher, states that, "It is not Werner's obligation to provide evidence of the magnitude of the burden imposed by this court." *Post* at 5 (Christopher, C.J., en banc dissenting opinion). First, we note that the Blakes argued to the trial court that the magnitude of Werner's burden was low, that there was little social utility associated with Werner's operational methods under the circumstances, and that positive and negative consequences associated with modified operations favored the Blakes. Second, we note that Werner did not contest these issues in the trial court or on appeal. Third (agreeing *arguendo* with Chief Justice Christopher), it is Appellants' clearly established obligation to provide argument and evidence in support of their contentions that the trial court erred and here they failed to comply with said obligation. *C.f.* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 3 (2010) ("The burden of precautions can take a very wide variety of forms. In many cases it is a financial burden borne by the actor, although likely passed on, to a substantial extent, to the actor's customers. In highway cases, the burden can be the delays experienced by motorists in driving more slowly, and the greater level of exertion motorists must make in maintaining a constant lookout. . . . In cases in which the negligence doctrine is applied to a person who loans a car to a friend with a known deficient driving record, the burden relates to the owner's inability to satisfy the friend's need. In certain situations, if the actor takes steps to reduce one set of injury risks, this would involve the burden or disadvantage of creating a different set of injury risks, and those other risks are included within the burden of precautions.").

are not provided the necessary oversight.

However, there was evidence to the contrary. For example, Werner instructed drivers in its winter training module to always keep their CB radios on. This constitutes evidence that it would not be too burdensome to equip Werner's 18-wheelers with CB radios and to let drivers use them; otherwise, Werner would not have included an instruction in its training module requiring drivers to have their CB radios on. And, as we noted above, the CDL manual already imposes a requirement on drivers to come to a crawl and then stop their 18-wheeler when encountering icy roads.

### v.    *Social Utility of the Actor's Conduct*

Similarly, neither the record nor Appellants' briefs contain any evidence or argument tending to establish any social utility associated with Werner's failures to provide the foregoing. Here, the Blakes' right to sue and recover for their injuries "must be considered in light of countervailing concerns," including (presumably) the social utility of facilitating timely and safe interstate commercial deliveries. *See, e.g.*, *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994) (social utility of eradicating sexual abuse); *see also Venetoulias v. O'Brien*, 909 S.W.2d 236, 242 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd) ("allowing Venetoulias to make the promise to arrange safe transportation without a corresponding duty to perform as he promised, serves no social utility and places only a slight burden on him. He negligently created the situation and failed to act reasonably . . ."). The contours of this utility were not presented by Appellants to the trial court or on appeal; in fact, Appellants never even used the phrase "social utility" in the trial court. Under these facts, Appellants have failed to preserve and to brief this issue.[14]

---

[14] *See Guajardo*, 562 S.W.3d at 781 ("It is not our duty to review the record, research the

The Blakes, however, did address this issue before the trial court.[15]  Even if we were to ignore Appellants' failures to preserve and brief this issue and proceed to analyze the merits, the social utility associated with Werner's conduct that caused the Blakes' catastrophic injuries is so minimal that it is foreseeably non-existent. Specifically, Werner entrusted a JIT load (with known consequences for failure to deliver on time) through West Texas during a Winter Storm Warning to a relatively new and unsupervised driver who scored the second-lowest possible score on a supervisor's evaluation only two weeks prior while knowingly failing to provide him with timely information about the dangerous weather conditions he would encounter

law, and then fashion a legal argument for an appellant when he has failed to do so.") (citing *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931-32 (Tex. App.—Houston [14th Dist.] 2008, no pet.)); *see also Reule*, 483 S.W.3d at 617 ("We conclude that Reule's discussion of this issue does not provide the court with sufficient information to examine any alleged error; therefore any such error is waived by inadequate briefing.") (citing *Goad*, 2015 WL 1640530, at *5 (holding that a "passing argument" that contains no substantive argument, analysis, or citation to the record or relevant authorities constitutes briefing waiver)); *Dominguez v. Am. Express Bank, FSB*, No. 14-17-00157-CV, 2020 WL 2832075, at *2 (Tex. App.—Houston [14th Dist.] May 29, 2020, pet. denied) (mem. op.) ("Dominguez has not provided any argument, analysis, or citations to legal authority in support of [his] assertions.  Even construing Dominguez's opening brief liberally, we cannot conclude that Dominguez adequately briefed any of these points and so we find briefing waiver.") (citing Tex. R. App. P. 38.1(i); *Marathon Petroleum Co. v. Cherry Moving Co.*, 550 S.W.3d 791, 798 (Tex. App.—Houston [14th Dist.] 2018, no pet.)); *Cruz*, 2019 WL 2942630, at *2 ("Even construing Santiago's appellate brief liberally, we cannot conclude that he adequately briefed any argument in support of this assertion . . . .  Therefore, we find briefing waiver.") (citing *San Saba Energy, L.P.*, 171 S.W.3d at 337; *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 198-99 (Tex. App.—Houston [14th Dist.] 2002, no. pet.)).

[15] Specifically, the Blakes argued that, "[W]hile there is great social utility in providing transportation services by commercial motor vehicle, the utility of doing so the way Werner routinely does and did in this case is low.  There is little utility in (1) assigning student drivers to JIT runs when they will be unsupervised the vast majority of the time, (2) providing drivers no weather information or route-selection assistance, (3) prohibiting student drivers from using basic safety devices like CB radios and outside air temperate gauges, (4) deliberately refusing to train its drivers to slow to a crawl and stop driving as soon as it is safe to do so when they encounter icy road conditions (contrary to the instructions in the CDL manual), (5) taking a route through an area where icy roads are predicted when there is a safer, shorter alternative route on another interstate highway, (6) failing to monitor the weather and road conditions en route when the route transverses an area covered by a Winter Storm Warning, and (7) having a student driver with no winter driving experience or training drive unsupervised through an ice storm."

or access to devices capable of ensuring he was aware of foreseeable conditions like Winter Storm Warnings and freezing temperatures. If there is any social utility present in such conduct, we fail to see it (at least in part because Appellants neither preserved nor briefed it).

### vi. Consequences of Placing the Burden on the Defendant

Neither the record nor Appellants' briefs reveal any burdensome consequences associated with imposing a duty on Werner to do something more than what it did to prevent the Blakes' injuries, *e.g.*, provide inexperienced and unskilled drivers like Ali with access to devices or information regarding foreseeable conditions like Winter Storm Warnings and freezing temperatures or refrain from assigning high-pressure JIT deliveries to novice drivers. Therefore, this issue is waived. *See* Tex. R. App. P. 38.1(i); *Reule*, 483 S.W.3d at 617 ("We conclude that Reule's discussion of this issue does not provide the court with sufficient information to examine any alleged error; therefore any such error is waived by inadequate briefing.") (citing *Goad v. Hancock Bank*, No. 14-13-00861-CV, 2015 WL 1640530, at *5 (Tex. App.—Houston [14th Dist.] Apr. 9, 2015, pet. denied) (mem. op.)). Additionally, because Werner already instructs drivers in its winter training module to always keep their CB radios on and the CDL manual already imposes a requirement on drivers to significantly reduce their speed and then stop their 18-wheeler when encountering icy roads, the consequences of placing this burden on Werner is a factor in favor of imposing a duty under the circumstances.

### vii. Balancing Analysis

In sum, an analysis of these factors yields the following conclusions:

| Risk | Very high given the (1) weather and road conditions, (2) unreasonably high speed of travel, (3) driver's lack of experience and skill, and (4) driver's inability to |
|------|------|

51

| | acquire information concerning the weather and road conditions. |
|---|---|
| Likelihood of Injury | Very high given the (1) weather and road conditions, (2) unreasonably high speed of travel, (3) driver's lack of experience and skill, and (4) driver's inability to acquire information concerning the weather and road conditions. |
| Foreseeability | Very high given the (1) weather conditions, (2) road conditions, (3) driver's subpar driving scores, and (4) driver's inexperience as a student driver while being assigned to a high-pressure delivery and being denied access to information concerning the weather and road conditions. |

*Versus*

| Magnitude of Burden | Appellants failed to present argument or evidence with respect to this factor. Nonetheless, there is some evidence that the magnitude of the burden is not significant. |
|---|---|
| Social Utility of the Actor's Conduct | Appellants failed to present argument or evidence with respect to this factor. Moreover, it is difficult to discern any social utility associated with inexperienced, unskilled drivers driving 18-wheelers at unsafe speeds in dangerous weather conditions (particularly when drivers are without access to readily acquirable devices that facilitate the detection of conditions giving rise to black ice). |
| Consequences of Placing the Burden on the Defendant | Appellants failed to present argument or evidence with respect to this factor. Nevertheless, there is some evidence that it would not be significantly burdensome to impose a duty on trucking companies such as Werner under the circumstances. |

Together, these factors when viewed through the risk-utility test impose a duty on trucking companies to (1) refrain from preventing their drivers from accessing information about foreseeably dangerous weather conditions while they are driving through those conditions; and (2) refrain from assigning inexperienced or low-scoring drivers to high pressure deliveries, such as JIT runs. *Otis Eng'g Corp.*, 668 S.W.2d at 311 ("[W]hen, because of an employee's incapacity, an employer exercises control over the employee, the employer has a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others. Such a duty may be analogized to cases in which a defendant can exercise some measure of reasonable control over a dangerous person when there is a recognizable great danger of harm to third persons.") (citing Restatement (Second) of Torts: Duty of Those in Charge of Person Having Dangerous Propensities § 319; William L. Prosser, The Law of Torts, § 56, at 350 (4th ed. 1971)); *cf. Sentry Select Ins. Co. v. Drought Transp., LLC*, No. 15-CV-890 (RCL), 2017 WL 5382168, at *2 (W.D. Tex. May 3, 2017) ("For example, a motor carrier has a duty under 49 C.F.R. § 390.11 to require its drivers to observe duties or prohibitions prescribed to a driver under 49 C.F.R. Subchapter B. Accordingly, if a motor carrier fails to enforce those duties, it may be liable for *its own negligence* in failure to follow the FMCSR.") (emphasis added).

### b. Breach

Having determined that Werner owed the Blakes a duty to exercise ordinary care which included (1) not restricting its commercial drivers from accessing information and equipment that would reveal the existence of foreseeably dangerous weather or road conditions (including Winter Storm Warnings and black ice) and (2) refraining from assigning JIT deliveries to student drivers or subpar drivers with low

53

scores, we next assess whether the evidence is legally and factually sufficient to support the jury's finding that Werner breached that duty.

The jury heard evidence that was legally and factually sufficient to support the jury's finding that Werner breached its duty of care under the circumstances. Specifically, the jury heard that (1) Werner actively denied Ali access to devices which would have conveyed relevant information concerning the weather and road conditions into which he was driving during a Winter Storm Warning while traveling at approximately 50 miles per hour on a JIT delivery; (2) Ali received the second lowest score possible on his driving exam; and (3) Ali was nonetheless entrusted with a JIT run through a Winter Storm Warning without access to relevant information or a supervisor who was awake. The jury also heard that (1) Werner's director of safety was unfamiliar with Werner's practice of pairing student drivers with trainers on JIT deliveries; (2) it is "really important for the driver to monitor the outside air temperature . . . because we know once it drops below 32, that's the condition that creates freezing water and therefore, freezing rain and black ice"; and (3) despite this importance, Ali was actively and knowingly prevented from monitoring the outside air temperature. Crediting this evidence in favor of the verdict, reasonable and fair-minded jurors could have concluded that Werner breached its duty to exercise ordinary care with respect to the Blakes.

### c. Causation

Appellants also attack the legal and factual sufficiency of the evidence supporting the jury's proximate cause finding. In that regard, they contend that prohibiting Ali from using a CB radio and an OAT gauge cannot support the jury's proximate cause finding because (1) there is no evidence Ali would have heard other truck drivers' conversations around the time of the accident had he been listening to the CB radio and, regardless of what Ali might have heard, he was listening to a

54

commercial radio station which also would have provided him with weather and traffic reports; (2) an "OAT gauge does not measure ground temperature, which is always warmer than ambient air temperature"; and (3) "Ali already knew the ambient air temperature was at or below freezing when he took his break in Sweetwater", he experienced the cold air firsthand, and he would not have concluded "the travel portions of the westbound lanes of I-20 were icy based on what he was seeing." We reject Appellants' assertions for several reasons.

First, there is evidence Ali would have heard other drivers' conversations around the time of the accident had he been allowed to listen to a CB radio. The Blakes presented testimony that "all over the CB chatter" drivers were saying that "if you want to . . . risk a human's life over trying to get your load there on time, it's not worth it." Tow-truck driver assistant James Wampler stated that "seasoned truck drivers" were coaching "unseasoned or new truck drivers on the radio." On CB radio, "new drivers [were] asking seasoned drivers what they should do about driving on the ice"; new drivers would ask experienced drivers if they thought "it would be safe to keep going, you know, to push — to push hard to get through the storm," but "older drivers . . . were telling them, no," and advised that "[n]o matter where you're at, pull off in the ditch, whatever, shut it down."

Second, Appellants incorrectly assert that Ali was listening to a commercial radio station and could have heard weather and traffic reports there. The record, however, reveals that Ackerman prohibited Ali from listening to commercial radio because Ackerman wanted to sleep and also limit any distractions for Ali.

Third, to the extent Appellants' statement that an "OAT gauge does not measure ground temperature, which is always warmer than ambient air temperature" is an attempt to dismiss an OAT gauge's importance or even intimate it is worthless in detecting ground temperature to assess whether ice is on the road, it is misguided

55

and imprudent.  Experts at trial, including Werner's director of safety Carlos Romay, agreed that an OAT gauge is a valuable tool and is considered safety equipment. Romay agreed that when there is a "prediction of light-freezing rain which we know creates black ice . . . it's really important for the driver to monitor the outside air temperature" by either "a cell phone or through the OAT, or outside air temperature gauge, on his truck because we know once it drops below 32, that's the condition that creates freezing water and therefore, freezing rain and black ice."  One of Werner's directors of safety (James Kochenderfer) also testified he wished Ali "had the temperature up on the display."

Fourth, Appellants' assertion that "Ali already knew the ambient air temperature was at or below freezing when he took his break in Sweetwater" and experienced the cold air firsthand is not supported by the evidence.  Instead, Ali testified that he (1) did not know what the "outside air temperature was when [he and Ackerman] left the yard in Dallas" but he had no reason to disagree "it was in the 40's"; (2) he did not know that the temperature "close to the area that the National Weather Service warned that the ice was going to be on the roads" was below freezing because he "didn't have the gauge on the truck" because "Werner wouldn't let [him] have it"; (3) did not remember the truck stop in Sweetwater at all as there "wasn't anything out of the ordinary that happened" and could not remember doing "anything to try to get an update on what the weather was like heading towards the area that [he was] going"; (4) "didn't check the weather app or news channel or anything"; and (5) knew "it was cold" but he did not "remember what the weather was like."

Fifth, when read in context, Appellants' contention that "Ali confirmed he would not have concluded the travel portions of the westbound lanes of I-20 were icy based on what he was seeing" is not supported by the record.  Rather, Ali

confirmed that if Werner had informed him that he was "heading straight towards the area where there's freezing rain making black ice on the highways and they had let [him] use the outside air temperature gauge so [he] could tell that by the time [he] got to the area that National Weather Service said this was happening the temperature was in the 20's," he would have considered it or taken it into consideration; but from everything at that point, "[he] didn't have anything — any reason to believe" there was ice on the highway. Ali also responded that "[i]t would be helpful if I had those tools" when he was asked if he wished Werner had communicated to him that he was driving "towards the area where there's freezing rain making black ice" and let him use an OAT gauge. In context, Ali seemed to confirm that had Werner told him he was heading towards freezing rain and let him use a temperature gauge, he would have been able to determine that the temperature was in the 20's. Without that information, he had no reason to believe there was black ice on the highway.

Finally, Appellants claim that assigning Ali to make a JIT delivery could not have proximately caused the accident because (1) he did not know he was making a JIT delivery until he was asked to testify; and (2) the "accident could just as easily have involved a non-trainee/trainer team on any other delivery." We reject these arguments.

Although Ali testified that he did not know he was on a JIT delivery, controverting evidence showed that he received a message on his 18-wheeler's in-cab Qualcomm messaging system three minutes after leaving the yard with the truck load informing him: "YOU ARE UNDER A JUST IN TIME LOAD. ON TIME SERVICE IS CRITICAL." Thus, Ali's testimony is contradicted by evidence showing (1) Ali received a message telling him that he was on a JIT delivery, (2) Ali was delivering a load for Con-Way, and (3) all Con-Way deliveries were JIT

57

deliveries.

Further, Appellants' claim that this collision "could just as easily have involved a non-trainee/trainer team" is implausible because (given the record before us) a reasonable and fair-minded jury could have concluded that an experienced and skilled driver would (1) have been allowed to listen to CB radio and use an OAT gauge to determine the outside temperature and understood he was driving on ice; (2) have recognized the dangerous weather conditions that foreseeably included black ice; (3) not have driven at an unreasonably high speed; (4) have reduced his speed to a crawl; and (5) have stopped the truck as soon as feasible.

Moreover, the record contains the following evidence in support of the jury's proximate cause finding:

(1) it is "really important for the driver to monitor the outside air temperature . . . because we know once it drops below 32, that's the condition that creates freezing water and therefore, freezing rain and black ice";

(2) Ali did not know it was below freezing at the time because he did not "have the gauge on the truck";

(3) Ali did not have a temperature gauge on the truck because he was not permitted to use one;

(4) Werner taught Ali in "other [training] modules" about CB radios;

(5) Ali's supervisor prohibited him from using a CB radio (even when the supervisor was asleep);

(6) Ali "never used" the CB radio during the entire trip;

(7) Ali believed it would have been helpful if he had those tools available to him;

58

(8) if Werner had informed Ali of the Winter Storm Warning that he would "be as safe as possible";

(9) Ali passed three crashes on the highway before colliding with the Blakes;

(10) one of Werner's directors of safety (James Kochenderfer) wished Ali had his CB on and "had the temperature up on the dash";

(11) Ali personally believed that 2.6.2 was "a very good recommendation" that drivers are "not required to follow";

(12) testimony from Werner's vice-president of safety and compliance (the third highest position at Werner) that:

(a) Werner's winter driving training module stated, "If you have a CB radio in your truck, you should always have that turned on. There's a lot of information that can be learned from listening to the conditions ahead. There could be accidents, there could be slick spots that other drivers might report. It's good information to know";

(b) he did not know Werner's 2014 winter storm training module contained the foregoing instructions about CB radios;

(c) Werner's company policies and teachings (particularly its decision to stop teaching its drivers to stop tying shoestrings to their mirror brackets to see if they freeze) were based on its drivers reporting that the number one thing they look for (rather than the number one thing Werner teaches its drivers) is "to see if there's ice on the roadway is the spray from the vehicles coming up from those traveling around them"; and

(13) the foregoing method is flawed because drivers "cannot look at spray coming off a tire when there has been freezing rain and there's been

59

moisture in the air. There's going to be a small, thin layer on top of solid ice and it's even more slippery".

Based on the record before us, we conclude that there is sufficient evidence to support the jury's finding that Werner's negligence proximately caused the collision.

## 2. Negligence Liability Finding in Question 2

We next address Appellants' arguments challenging the jury's negligence finding in Question 2, which provided as follows:

### Question 2

Was the negligence, if any, of Werner acting through its employees other than Shiraz Ali in the manner stated below a proximate cause of the injuries in question?

Consider Werner's negligence, if any, in the following

A    supervising Shiraz Ali, but only if you find that Shiraz Ali was incompetent or unfit, and Werner knew, or through the exercise of ordinary care should have known, that Shiraz Ali was incompetent or unfit, thereby posing an unreasonable risk of harm to others, and

B    training Shiraz Ali[.]

"Negligence," when used with respect to the conduct of Werner, means failure to use ordinary care, that is, failing to do that which a trucking company of ordinary prudence would have done under the same or similar circumstances or doing that which a trucking company of ordinary prudence would not have done under the same or similar circumstances[.]

"Ordinary care," when used with respect to the conduct of Werner, means that degree of care that would be used by a trucking company of ordinary prudence under the same or similar circumstances[.]

"Proximate cause," when used with respect to the conduct of Werner, means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred[.] In order to be a proximate cause, the act or

60

omission complained of must be such that a trucking company using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom  There may be more than one proximate cause of an injury[.]

Answer "yes" or "no"

### a.  Duty

In their brief, Appellants have not disputed that Werner owed a duty to train and supervise its employee Ali.  Further, employers in Texas owe certain non-delegable duties to their employees, including the duties to train and supervise their employees.  *See Diamond Offshore Drilling, Inc. v. Black*, 652 S.W.3d 463, 473 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *Kroger Co. v. Milanes*, 474 S.W.3d 321, 335 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

### b.  Breach

Therefore, we turn to Appellants' contention that there is legally and factually insufficient evidence to support the jury's finding that Werner was negligent because it "properly trained and supervised Ali."  In that regard, Appellants claim the evidence does not support a finding that Werner negligently trained Ali because (1) Ali participated in Werner's 275-hour new driver training program; (2) Werner trained Ali "on winter driving, speed management, and other driver-related topics"; (3) Ali was provided a copy of the CDL manual; and (4) Ali participated in "a quarterly driver safety meeting."  We disagree.

Even when we accept Appellants' contention that they provided Ali with a copy of the CDL manual, the jury heard evidence that they (1) failed to reasonably train him and (2) knew he was unreasonably trained.  Section 2.6.2 of the CDL manual contains the safety rule instructing drivers to reduce their speed to "a crawl" when they encounter icy roads.  As truck safety expert Arthur Atkinson confirmed, "a crawl" means a speed between 10 and 15 miles per hour, but no more than 15.

61

Atkinson testified that "the point of crawling" is to stop. He explained that the "ultimate purpose is not just to crawl along for 100 miles" but to "get down to a speed that you can control and gives you time to do the right thing at the right time and if the worst thing happens, when you have an accident, it won't be bad. Until you can get off the road and get stopped and wait until the conditions change, as they will."

The jury also heard testimony that following this safety rule in section 2.6.2 is not discretionary and that Werner nonetheless taught its drivers that, unless "they feel that they're unsafe," they can choose whether to come to a crawl or stop in icy road conditions. Ali even stated that he believed section 2.6.2 was "a very good recommendation" that drivers are "not required to follow." Conversely, Atkinson testified that it is "ludicrous" to not follow section 2.6.2. The jury also heard that Werner taught its truck driving students that they should stop the truck if they felt unsafe, but that if they did not feel unsafe, they could keep driving. The jury could reasonably have determined that Werner did not properly train Ali when it taught him to not follow mandatory safety rules.

The Blakes also presented evidence that Ali had not taken Werner's "Winter Driving Training Module" and did not even know what the training module was called. In fact (and contrary to Appellants' assertion that Ali participated in Werner's 275-hour new driver training program), the jury heard that Ali only had "55 hours in this student driver training program under [his] belt" at the time of the accident and had never before driven a truck for a living. Ali was never trained on ice, snow, or other difficult road conditions, and evidence showed that Ali had the second-lowest possible evaluation score just two weeks before this collision. Therefore, the jury reasonably could have concluded that Ali was not properly trained.

Appellants further claim that "in light of Ali's training and driving experience, the evidence is legally and factually insufficient to support a finding that Ali was either incompetent or unfit to drive on December 30. Thus, under the charge submitted at the Blakes' request, the evidence is legally and factually insufficient to support any finding that Werner was negligent in supervising Ali."

The charge required the jury to find that Ali was incompetent or unfit before determining that Werner was negligent in supervising Ali. However, the charge did not define the terms unfit or incompetent. When no definition is provided in the charge, jurors may use any reasonable, ordinary, or common understanding of the terms used. *Dorton v. Chase*, 262 S.W.3d 396, 399 (Tex. App.—Waco 2008, pet. denied).

The Blakes presented evidence that Ali was a novice/student driver who had "very little experience and training, certainly not dealing with these kind of" weather conditions. Atkinson testified that Ali's "school was two weeks and two days long, and he'd only been out another six and a half days before this day of the accident." Atkinson explained that there "just wasn't enough time for him to gain experience. There's no evidence he was ever trained on ice by his trainer or snow or anything else that deals with difficult road conditions; and he didn't see what few training films they had, which were substandard even at their best." Ali was unable to recognize that the roads were icy leading up to the accident; he also had a very low evaluation score. The jury reasonably could have concluded that Ali's lack of proper training and lack of experience driving 18-wheelers in dangerous winter weather made him an incompetent or unfit driver and that Werner knew or should have known that he was unfit or incompetent before assigning him this high-pressure load under these circumstances.

We also reject Appellants' contention that Werner supervised Ali because he

63

was (1) "accompanied at all times on December 30 by his co-driver and trainer, Jeff Ackerman, a driver with thousands of miles under his belt"; and (2) "supervised through various state-of-the-art safety equipment, including a Mobileye that could trigger an alert to Werner if Ali followed another vehicle too closely, a governor that limited the Werner truck's speed to 65 miles per hour, and a stability control system that could detect any loss of traction."

Ackerman may have accompanied Ali, but Ackerman certainly did not supervise Ali while he was sleeping through treacherous weather. Appellants mention that Ackerman was "a driver with thousands of miles under his belt," but that means nothing when he was asleep and did not use his experience to train and supervise an incompetent or unfit driver in adverse conditions.

Further, Appellants' contention that Werner supervised Ali through the listed state-of-the-art safety equipment is not evidence of supervision in this case. None of the listed equipment could have helped Ali recognize the dangerous black ice on the road and instructed him to slow to a crawl or stop the truck. Further, the record shows that Werner did not warn Ali of the conditions on I-20 that day. Ackerman could have done so had he been supervising Ali instead of sleeping. The factfinder reasonably could have determined that Werner breached its duty to supervise and train Ali. Thus, we conclude that there is legally and factually sufficient evidence to support the jury's finding that Werner was negligent in training and supervising Ali.

### c.    Causation

Finally, Appellants' assert Werner's negligent training and supervision did not proximately cause the collision because (1) Werner properly trained Ali; (2) the "evidence is legally and factually insufficient to conclude that, if Werner instructed Ali again about these same matters, this accident would not have occurred"; (3) "no

64

evidence supports a finding that additional supervision would have prevented this accident"; and (4) "the evidence established that Ali acted reasonably and prudently in this accident, Werner's antecedent training and supervision is irrelevant[,] and [it] cannot support a liability finding against it in this case."

We reject Appellants' contention for several reasons. First, contrary to Appellants' assertion and as we discussed above, Ali was not properly trained by Werner. Second, Werner's contention that "additional supervision" would not have prevented the accident is baffling and nonsensical when there was no supervision of Ali (or of the weather through which he was traveling) for several hours before the collision occurred. Third, we already held that the evidence does not establish that Ali acted reasonably and prudently. Fourth, had Werner reasonably supervised Ali, he would not have been permitted to drive at an unreasonable and dangerous speed on icy roads during a Winter Storm Warning. Finally, had Werner properly trained Ali, he would have recognized the conditions giving rise to black ice as well as reduced his speed to "a crawl" and then stopped his 18-wheeler once he encountered icy roads as mandated by the safety rule in section 2.6.2 of the CDL manual. Therefore, we conclude that there is sufficient evidence to support the jury's finding that Werner's negligent training and supervision proximately caused the collision.

Accordingly, we overrule Appellants' third issue.

## IV. The Apportionment Questions and the Jury's Findings in Response

Asserting that the trial court "erroneously submitted three separate comparative responsibility questions," Appellants argue in their fourth issue that chapter 33 of the Texas Civil Practice and Remedies Code "contemplates the submission of a single comparative responsibility question." Appellants cite section 33.003 to support this contention which states, in relevant part:

The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1)     each claimant;

(2)     each defendant;

(3)     each settling person; and

(4)     each responsible third party who has been designated under Section 33.004.

Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). But, contrary to Appellants' contention, this section does not mandate a single comparative responsibility question. Moreover, Appellants did not cite — and our research did not find — any case law or other authority holding that a trial court may not submit multiple comparative responsibility questions.

Rather, case law suggests that a single comparative responsibility question is not universally appropriate and may necessitate a new trial when it requires the jury to segregate liability amongst improperly-included parties. *See, e.g.*, *Diamond Offshore Drilling*, 652 S.W.3d at 483 ("Because the jury foreseeably could have apportioned liability differently had Diamond Rig not been included in the charge, a new trial is warranted."); *Heritage Hous. Dev., Inc. v. Varr*, 199 S.W.3d 560, 571 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Similarly, a new trial is necessary in this case, because the jury reasonably could have apportioned liability differently as between Houston Garden and the remaining defendants if HHD had not been included in the negligence charge."). Therefore, we decline to impose this limitation here.

66

Appellants also contend that the evidence is legally and factually insufficient to support the jury's apportionment findings in response to Questions 5, 6, and 7 and argue:

- With respect to Question No. 5, "Appellants' combined fault, if any, should have been far less than the 84% found."

- With respect to question No. 7, "Ali's individual fault should have been far less than the 45% assigned to him in Question 7."

- Werner's actions or failures to act cannot "account for the 17% and 39% differences found by the jury in answering Questions 5, 6, and 7."

Aside from these bare assertions, Appellants do not cite any specific evidence to support their challenges.

The law gives the jury wide latitude in determining the negligent parties' proportionate responsibility. *See In re Campbell*, 577 S.W.3d 293, 305 (Tex. App.— Houston [14th Dist.] 2019, orig. proceeding). "Even if the evidence could support a different percentage allocation, we may not substitute our judgment for that of the jury." *Id.*

We conclude legally and factually sufficient evidence supports the challenged findings. The relevant testimony and evidence have been set out in detail above. From this evidence, the jury reasonably could reach the comparative-responsibility findings in response to Questions 5, 6, and 7.

We overrule Appellants' fourth issue.

## V. Evidentiary Issues

In their fifth issue, Appellants assert that the "trial court's multiple evidentiary errors warrant a new trial." Appellants identify five alleged errors:

1. The trial court erred in admitting evidence of "numerous dissimilar, unrelated accidents."

2. The trial court permitted the Blakes' trucking expert, Art Atkinson, to "testify on matters outside the scope of his purported expertise and to offer opinions that lacked a reliable foundation."

3. The trial court erred by overruling Appellants' objections to testimony from the Blakes' forensic expert, Robert Johnson, because Johnson was unqualified and his testimony relies on "financial machinations, faulty logic, and pure guesswork."

4. The trial court erred in admitting testimony from the Blakes' crash reconstruction expert, James Crawford, "specifically his hypothetical and conjectural opinions."

5. The trial court erred in admitting "James Wampler's testimony concerning hearsay conversations that allegedly occurred on the day of this accident via CB radio."

Appellants assert that the "combined effects" from these evidentiary errors "resulted in cumulative harmful error." We begin with the applicable standard of review, examine each of these arguments individually, and conclude the trial court's rulings did not constitute an abuse of discretion.

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 918 (Tex. 2004); *GB Tubulars, Inc. v. Union Gas Operating Co.*, 527 S.W.3d 563, 571 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding principles. *Downer*, 701 S.W.2d at 241-42; *Harpst v. Fleming*, 566 S.W.3d 898, 904 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that basis was not raised in the trial court. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Harpst*, 566 S.W.3d at 904. Accordingly, we examine

all grounds for the trial court's decision that are suggested by the record or urged by the parties. *Harpst*, 566 S.W.3d at 905.

## B. Evidence of Other Collisions

In their first evidentiary challenge, Appellants assert the trial court improperly admitted evidence of three different types of collisions: (1) "prior unrelated collisions that occurred on Just-in-Time runs handled by Werner trainee/trainer teams"; (2) "other collisions on I-20 . . . many of which occurred more than 50 miles away"; and (3) "the classification of every other accident in which Werner had ever been involved as either preventable or non-preventable." We conclude that admitting these categories of evidence does not constitute reversible error.

In Texas courts, evidence of other collisions, near collisions, or related similar events is probative evidence so long as an adequate predicate is established. *In re Sun Coast Res., Inc.*, 562 S.W.3d 138, 148 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding) (citing *In re HEB Grocery Co.*, 375 S.W.3d 497, 502-03 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding)). "Prior to the admission of similar events, the plaintiff must first establish (1) a predicate of similar or reasonably similar conditions; (2) connection of the conditions in some special way; or (3) that the incidents occurred by means of the same instrumentality." *Id*. "The degree of similarity required depends on the issue the evidence is offered to prove." *Id*. (citing *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 138 (Tex. 2004)); *see also Henry v. Mrs. Baird's Bakeries, Inc.*, 475 S.W.2d 288, 294-95 (Tex. App.— Fort Worth 1971, writ ref'd n.r.e.) ("[t]here is no requirement that the conditions of the prior accident or occurrence be identical, the jury being well able to evaluate such minor variations as may exist").

Evaluated pursuant to these standards, admitting evidence of the three categories of collisions delineated above does not constitute an abuse of discretion.

## 1.     Other Collisions that Occurred During Just-In-Time Runs

During testimony by James Kochenderfer, one of Werner's directors of safety, evidence was admitted regarding two prior collisions involving a Werner trainer/trainee driving team that occurred on JIT runs.  The first one occurred in Colorado in 2013 during snowy and icy conditions; there, a Werner truck driven by a trainee struck another vehicle from behind while the supervisor was sleeping.

The second prior collision occurred in Oklahoma in 2015 when a "passenger vehicle was going on the on-ramp to the highway, hit icy road, [and] lost control in front of [a] Werner student driver."  The Werner student driver was traveling at approximately 59 miles per hour when he struck the passenger vehicle.

The evidence pertaining to these separate collisions adequately established a predicate of similar or reasonably similar conditions to the one at issue here.  *See In re Sun Coast Res., Inc.*, 562 S.W.3d at 148.  Specifically, all three collisions (1) involved a Werner trainer/trainee driving team, (2) occurred during snowy or icy conditions, and (3) happened while the student driver was driving.  Accordingly, admitting evidence of these collisions did not constitute an abuse of discretion.  *See Volkswagen of Am., Inc.*, 159 S.W.3d at 918.

## 2.     Other Collisions on I-20

Broadly referencing the testimony from three witnesses, Appellants assert the trial court erred by admitting evidence regarding other collisions on I-20 that occurred shortly before Ali's collision with the Blakes' vehicle.  These witnesses — Martin County Sheriff's Chief Deputy Ernest Wakefield, Helen Myers, and James Britain — testified about three collisions that occurred approximately 52 miles east of the collision at issue.

According to Chief Deputy Wakefield, he received a call concerning a crash at 3:30 p.m. on December 30, 2014. Although the collision was only three miles from Chief Deputy Wakefield's location, he testified that it took him approximately 13 minutes to travel there because "the roads were so icy [he] couldn't drive very fast or [he] would have gone out of control." According to Chief Deputy Wakefield, the incident to which he responded involved a single passenger vehicle that lost control on the eastbound lanes of I-20 due to ice on the roadway.

Shortly after responding to this incident, Chief Deputy Wakefield became aware of another collision that occurred nearby and involved a "pileup of vehicles" on the interstate's westbound lanes. While Chief Deputy Wakefield was responding to the pileup, a third collision occurred in which Helen Meyers was traveling westbound, saw "all the other wrecks that had occurred in front of her", hit her brakes, and lost control of her car on the icy roadway. According to Chief Deputy Wakefield, her car went through the median into the interstate's eastbound lanes and was struck by an 18-wheeler traveling east. Chief Deputy Wakefield testified that this collision occurred at approximately 3:48 p.m.

Helen Myers testified that when she saw the vehicle pileup ahead of her, she "tapped the brake to begin to slow [her] speed" and her car "immediately nosed off to the left" of the roadway. Myers said the highway was covered in black ice. Myers testified that her vehicle went through the median and collided with an 18-wheeler traveling in the interstate's eastbound lanes. Myers said she was not injured.

James Britain was driving the 18-wheeler that collided with Myers's car. According to Britain, the roadway was "covered in ice" at the time of his collision with Myers. Britain said he was traveling 5 miles per hour on the shoulder lane of eastbound I-20 when the collision occurred.

71

The evidence pertaining to these collisions established a predicate sufficient to warrant their admission and shows that they occurred under conditions reasonably similar to those near this particular stretch of I-20 at the time of Ali's collision with the Blakes' vehicle. *See In re Sun Coast Res., Inc.*, 562 S.W.3d at 148. Specifically, each of the three collisions — the single-vehicle incident, the vehicle pile-up, and Myers's collision with Britain's 18-wheeler — occurred approximately one hour before the collision at issue and 50 miles east of the Blakes' collision. According to the National Weather Service Winter Storm Warning, the winter storm was traveling from east to west. Moreover, Myers's collision with Britain's 18-wheeler bears striking similarities to the collision involving the Blakes: both involved a passenger vehicle that lost control, crossed the interstate's median, and collided with an 18-wheeler traveling in the opposite direction.

These collisions also bear another connection to the one at bar: they occurred on the same portion of I-20 that Ali traveled shortly before his collision with the Blakes' vehicle. Ali was specifically questioned about these collisions and asked whether he "passed not one, not two but three different car crash sites where there are cars either overturned or piled up . . . before [he] even got to our crash. You've seen that now, right?" In response, Ali said: "I mean, I can't remember — I am not going to deny I saw it, but I just can't remember seeing them. Most of the time I pass crashes, I don't sit there and stare at it." Ali also testified that he did not encounter any ice on the roadway before his collision with the Blakes' vehicle.

The testimony from Chief Deputy Wakefield, Myers, and Britain provides additional details regarding these collisions as well as the reported conditions on a relevant stretch of I-20 shortly before Ali's collision with the Blakes' vehicle. When combined with the other facts, these details allowed the jury to infer that reasonable 18-wheeler-trainee-drivers under the same or similar circumstances would have had

72

sufficient notice that there were dangerous conditions and that they needed to do something other than plow ahead at 50 miles per hour without supervision or training. Accordingly, the trial court did not abuse its discretion by admitting evidence of these three collisions on I-20.

### 3.    Classification of Werner's Other Collisions

Appellants also challenge evidence "admitted at the request of the jury" that "concerned the classification of every other accident in which Werner had ever been involved as either preventable or non-preventable." To support this argument, Appellants broadly complain about five pages of testimony from Kochenderfer in response to the following jury questions:

- "What is a chargeable versus a nonchargeable accident?"

- "Who or what determines if an accident is chargeable or nonchargeable?"

- "What percentage of Werner accidents are deemed chargeable versus nonchargeable?"

Appellants argue that "[t]he disparity in these determinations between the serious accidents investigated by Werner's legal department and the minor accidents investigated by its risk and safety department is easy to explain — 95% of the minor collisions involve obviously preventable accidents, such as a driver backing into a fixed object."

Appellants also assert that "[t]he trial court curiously allowed this evidence to be admitted at the request of the *jury* — not the parties." Appellants do not cite any authority to support their insinuation that the trial court's admission of evidence under these circumstances constituted an abuse of discretion. *See generally K-Mart Corp.*, 24 S.W.3d at 360 (a trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles).

First, we conclude Appellants' argument is waived as Appellants failed to cite any relevant authority. Tex. R. App. P. 38.1(i). Second, we conclude the trial court's admission of evidence was not unreasonable or arbitrary as it was in direct response to questions from the jury. *Cf. Sparks v. State*, 177 S.W.3d 127, 129 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (court did not abuse its discretion when it allowed jurors to ask questions of witnesses); *Fazzino v. Guido*, 836 S.W.2d 271, 275-76 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (same). Third, we decline Appellants' invitation to create new precedent holding that trial courts abuse their discretion when they act in a manner that is not prohibited by any known, cited, or argued authority.

We overrule Appellants' challenge asserting the trial court improperly admitted evidence of these three categories of collisions.

## C.    Testimony from Art Atkinson

In their second evidentiary challenge, Appellants argue that the trial court improperly allowed the Blakes' trucking expert, Art Atkinson, "to testify on matters outside the scope of his purported expertise and to offer opinions that lacked a reliable foundation." Specifically, Appellants assert Atkinson was unqualified to testify about (1) "the purpose of the federal government in enacting the provisions of the [Federal Motor Carriers Safety Regulations]"; (2) "the legal effect and purpose of the provisions of the CDL manual"; and (3) "the allegedly higher standard of care owed by motor carriers."

In determining the admissibility of expert testimony, the trial court has broad discretion and we review its ruling only for an abuse of that discretion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). Qualified experts may offer opinion testimony if that testimony is relevant and based on a reliable foundation. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). When

74

determining whether an expert's opinions are based on a reliable foundation, "the trial court does not decide whether the expert's conclusions are correct; instead, the trial court must determine whether the analysis used to reach those conclusions is reliable." *Harris Cnty. Appraisal Dist. v. Houston Laureate Assocs. Ltd.*, 329 S.W.3d 52, 57 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see also Null v. State*, 640 S.W.3d 370, 382 (Tex. App.—Houston [14th Dist.] 2022, pet. granted) (en banc) ("In evidentiary matters, a trial court is a gatekeeper, ensuring expert testimony is relevant and based on a reliable foundation.") (citing *In re J.R.*, 501 S.W.3d 738, 748 (Tex. App.—Waco 2016, no pet.)).

While Appellants assert that Atkinson was "unqualified" to testify about the challenged topics, the evidence shows otherwise. Testifying at trial, Atkinson stated that he is a "truck safety expert" with over 40 years' experience in the trucking industry; Atkinson also testified that he is familiar with the Federal Motor Carrier Safety Regulations, states' CDL manuals, and other commercial vehicle safety publications. Atkinson said he began his trucking career by driving commercial trucks for two years delivering "all types of products" and "driving all types of vehicles under all kinds of conditions and terrain." Atkinson testified that, after driving commercial trucks, he "became the director of safety for a major trucking company" for three years. Atkinson proceeded to assume roles as "director of safety or the vice president of safety for several trucking companies." Atkinson said he spent a total of nine years "running a safety department for a trucking company." In these roles, Atkinson said he received "thousands of hours of education" regarding commercial truck driving regulations. In addition, Atkinson testified that he has written commercial driving policies and procedures for "a great number of companies" as well as "preventability manuals". Atkinson said that, over the course of his career, he has driven approximately 800,000 miles in an 18-wheeler.

According to Atkinson, he started doing consulting work in 1987; in this role, he would work with "[t]rucking or bus compan[ies]" to assist them in understanding "why they're having accidents and in some cases why they were in trouble with the Department of Transportation." Atkinson said he had worked with companies' presidents, safety directors, and drivers to improve driving safety and assisted with "writing a company policy manual." Against this backdrop, Appellants' bare assertion that Atkinson was "unqualified" to testify about the challenged topics does not show the trial court's admission of this testimony constituted an abuse of discretion.

Appellants also assert that Atkinson's opinions "were not only arbitrary but internally inconsistent." Appellants cite three examples to support this assertion:

1.  "Atkinson opined Werner drivers had no discretion to *ever* drive when ice was suspected of being present, but claimed he was properly shown 'how to drive in all types of conditions including on black ice' by 'an old knight of the road.'" (emphasis in original) (citations omitted).

2.  "Atkinson opined the [Department of Transportation's] 1997 interpretation of the extreme caution regulation giving drivers discretion to proceed was outdated, but based his opinions on material over 20 years old." (citations omitted).

3.  "Atkinson opined J.J. Keller's publications were reliable, but chastised Werner for following that same organization's training guide." (citations omitted).

These arguments and the testimony cited to support them do not demonstrate inconsistencies in Atkinson's testimony that establish the trial court abused its discretion.

With respect to the first example, Atkinson testified that he learned how to drive an 18-wheeler from "an old knight of the road" who "taught [Atkinson] how to drive under all kinds of conditions, including on black ice." Recounting this

76

experience did not preclude Atkinson from providing an expert opinion concerning requirements in the Texas CDL manual with respect to driving on black ice, *i.e.*, "drive slower and smoothly" and "stop at the first safe place." Atkinson testified that the Texas CDL manual is based on the Essex Corporation's "model manual" from 1986. Accordingly, the Texas CDL manual was published after Atkinson learned how to drive an 18-wheeler on black ice. We therefore reject Appellants' contention that an expert who learns how to do something (*e.g.*, drive on black ice) should be precluded from testifying the thing they learned how to do should not be done. Moreover, Atkinson's opinion testimony on this point was based on the education and experience he accumulated over the four decades after the challenged conduct occurred.

With respect to the second example, Atkinson did not testify that "the [Department of Transportation's] 1997 interpretation of the extreme caution regulation giving drivers discretion to proceed was outdated." Instead, Atkinson testified regarding a January 1997 interpretation from the Department of Transportation entitled "On Guard". This publication states, in part:

> Recent contacts with truck and bus operators indicate that some, particularly smaller operators, are mistakenly assuming that if a driver possesses a Commercial Driver's License (CDL), he or she is a trained and experienced commercial vehicle driver. This is not true and can be a very dangerous mistake.

Werner did not cite — and our review of the record did not find — any portion of Atkinson's testimony suggesting this January 1997 interpretation (or any other 1997 interpretation) is "outdated." *See* Tex. R. App. P. 38.1(i) (requiring citations to the record). Therefore, there is no inconsistency revealing an abuse of discretion.

With respect to the third example, Atkinson addressed this alleged inconsistency in his testimony. Werner's counsel questioned Atkinson regarding his

opinions on various trucking safety publications, including those from J.J. Keller. Atkinson testified that they are "reliable" but noted that they are "entry-level stuff". Werner's counsel then pointed out that these publications do not instruct drivers that "if you are on ice that you must reduce your speed to a crawl and get off the road as soon as possible." Atkinson and Werner's counsel then had the following exchange:

COUNSEL: You just testified that these are reliable sources, sir?

ATKINSON: Ma'am, there is so much more in those manuals than just this section. Not all of it is accepted by safety professionals in the industry. This is accepted by the government and safety professionals. There are portions in this that are written so that trucking companies will not reject these books and students and the same with schools.

We understand that. And so there are sections that we're not going to accept, and there are other sections that are correct as a — at a foundational level. But this book and this book set the foundation; and everything else that's better, we accept.

As this testimony shows, Atkinson drew a distinction between his general thoughts regarding the J.J. Keller publications and those publications' specific recommendations regarding driving on ice. Under the facts of this case, the absence of detail in a foundational authority does not reveal an affirmative inconsistency with subsequent authorities that contain additional details.

In sum, these arguments do not show that the admission of Atkinson's testimony constituted an abuse of discretion. We therefore overrule Werner's challenges to Atkinson's testimony.

### D.     Testimony from Robert Johnson

Appellants also assert that Robert Johnson (1) "used financial machinations, faulty logic, and pure guesswork to increase the Blakes' damages claims", and (2) "was unqualified to opine on the future prices of the medical expenses" reflected in Brianna's lifecare plan.  We consider below in section VI Appellants' challenge regarding the substance of Johnson's testimony.  In this section, we analyze only Appellants' contention regarding Johnson's qualifications as an expert.

We disagree with Appellants' argument that Johnson was "unqualified" to render an opinion regarding the price of future medical expenses.  Johnson testified that he has a bachelor's degree in business administration with a major in economics, a master's degree in business administration with a major in finance and investments, and "postgraduate training with the Strategic Planning Institute and the American Management Association."  Johnson said he previously worked as an investment banker and had experience managing retirement portfolios, running mergers and acquisitions, and directing capital budgeting.  According to Johnson, as an economic expert he has evaluated "several thousand" life care plans.

Courts have found similar education and work experience sufficient to show a person is qualified to offer expert economic testimony.  *See, e.g., KMG Kanal-Muller-Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 390 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  Appellants did not cite any case law or other authority to support their argument that Johnson is unqualified to render an opinion on the future prices of medical expenses in this case.  *See* Tex. R. App. P. 38.1(i).  Therefore, we overrule Appellants' challenge to Johnson's qualifications.

## E. Testimony from James Crawford

Appellants summarily assert that the trial court erred by admitting Crawford's "hypothetical and conjectural opinions . . . concerning what might have occurred had Ali ceased driving or slowed to a crawl." On this point, Crawford testified as follows:

> [I]f [Ali] had slowed down to 15 miles per hour at the beginning of where this driver actually began to perceive the pickup truck coming across the center divide, if he'd been going 15 miles an hour at that point, whether he's in the left lane or the right lane, and took the same actions that he took here, the crash never would have happened, the pickup truck would have spun out safely across the roadway, across the other side into the grass, into the tumbleweeds over there, and it would not have overturned because there was nothing for it to hit, there were no other cars coming besides that black SUV, which was already out of the way by the time they got across the road. According to the driver, there were no other vehicles around him. So I've seen no evidence at all that there were any other vehicles that this pickup truck would have hit if the driver had slowed to 15 miles an hour in the semi, in the 18 wheeler.
>
> There w[ere] no physical obstructions out there. There w[ere] no trees, there were no fire hydrants, no major ditches, anything that would cause harm to the truck, pickup truck or its occupants as it spun out to a normal final rest.
>
> So that's what we're going to be showing here is if the Werner tractor-trailer had been going 15 miles an hour at the time when the pickup truck began to cross the center median, this is what happens.

Admitted during Crawford's testimony was an animation showing this chain of events, in which the Werner Truck was traveling 15 miles per hour and the Blakes' vehicle crossed the westbound lanes of I-20 unimpeded before coming to a rest in the median between the interstate and the service road.

As discussed above with respect to Atkinson's testimony, an expert's opinion must be based on a reliable foundation. *See Gharda USA, Inc.*, 464 S.W.3d at 348.

80

"Reliability may be demonstrated by the connection of the expert's theory to the underlying facts and data in the case." *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010). Here, Crawford's opinion regarding what would have occurred if Ali had been traveling at 15 miles per hour meets that standard.

Crawford testified that he attended "schools that dealt with traffic crash investigation, traffic crash reconstruction, heavy truck brake courses, and all different kinds of courses in crash reconstruction" and has been working as a full-time accident reconstructionist since 1999. To form his opinions, Crawford stated that he examined and analyzed multiple types of evidence pertaining to the collision, including (1) evidence at the crash scene, (2) the vehicles' locations afterwards, (3) the location of physical evidence from the impact, (4) the vehicles' post-collision conditions and damage patterns, (5) engine module data recovered from the Werner Truck (including its deceleration rate as it went through the crash sequence), (6) crash scene photographs, and (7) depositions and written statements from witnesses and responders. Relying on this evidence, Crawford calculated the Werner Truck's "drag factor" (which measures the truck's deceleration rate). Noting that the drag factor was lower than expected, Crawford opined that "there was ice [on] the roadway and [that] would certainly degrade the deceleration rate." Based on this evidence and his calculations, Crawford said he formulated animations to show "a representation of his opinion in this case." One of those animations showed that if the Werner Truck had been traveling 15 miles per hour when the Blakes' vehicle crossed the westbound lanes of I-20, the Werner Truck would not have collided with the Blakes.

Courts have found similar evidence sufficient to show the reliability of an accident reconstructionist's opinion. *See, e.g.*, *id*. at 235, 239 (concluding that the expert's "observations, measurements, and calculations were . . . tied to physical

81

evidence in the case which likewise provided support for his conclusions and theory" thus "meet[ing] our standard for reliability"); *Waring v. Wommack*, 945 S.W.2d 889, 892-93 (Tex. App.—Austin 1997, no writ) (accident reconstructionist's opinion was reliable and admissible because it was based on physical evidence from the scene and tests performed on that evidence). Appellants did not cite any cases or other authority to support their contention that an accident reconstructionist cannot testify regarding what would have happened if certain factors involved in the collision were different. Accordingly, we conclude the trial court did not abuse its discretion by permitting Crawford to testify regarding what would have occurred if Ali had been traveling 15 miles per hour when the Blakes' vehicle crossed the median.

### F.      Testimony from James Wampler

In their final evidentiary challenge, Appellants assert the trial court erred in admitting "James Wampler's testimony concerning hearsay conversations that allegedly occurred on the day of this accident via CB radio."

On the day of the collision, Wampler was working as part of a wrecker team and had spent "[b]asically all day . . . cleaning up accidents between Pecos and Odessa." Wampler was riding passenger in a wrecker truck as it was traveling east on I-20 when he saw the "bed of [the Blakes'] pickup flying through the air." According to Wampler, "it looked like the truck was cut in half."

During his testimony, Wampler was asked, "[d]id you hear any new drivers asking seasoned drivers [on the CB radio] what they should do about driving on the ice?" In response, Wampler testified:

> Yes, sir. Basically the — they would ask, you know, hey do you-all think it would be safe to keep going, you know, to push — to push hard to get through the storm? And you'd — you — you could tell they were older drivers. They were telling them, no, because if you push that hard during a bad storm or — like I said, if it's raining real hard, you can't

see past the hood of your truck, but — or like what they call a rainout or whiteout, just park. No matter where you're at, pull off in the ditch, whatever, shut it down.

Challenging this response, Appellants assert that "[t]hese hearsay conversations do not fall within any recognized exception." We reject Appellants' contention because Wampler's statement is not hearsay.

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). "If an out of court statement is not offered for the truth of the matter asserted, but for the purpose of showing what was said, the statement is not hearsay." *Jackson v. State*, 889 S.W.2d 615, 616 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (citing *Livingston v. State*, 739 S.W.2d 311, 331 (Tex. Crim. App. 1987)). Here, Wampler's statements were not offered to prove the truth of the matter asserted, *i.e.*, that drivers who were pushing hard during severe storms should park. Instead, Wampler's statements tended to prove (1) that other truck drivers said that drivers who were pushing hard during severe storms should park and (2) that Ali would have been on notice thereof if Werner had allowed him to listen to a CB radio. Therefore, Wampler's testimony is not hearsay. *Union Nat. Gas Co. v. Enron Gas Mktg., Inc.*, No. 14-98-00183-CV, 2000 WL 350546, at *8 (Tex. App.—Houston [14th Dist.] Apr. 6, 2000, no pet.) ("[I]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") (citing Fed. R. Evid. 801(c) advisory committee notes); *Pope v. Darcey*, 667 S.W.2d 270, 273 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("[W]e find that none of [the statements] were admitted for their truth or falsity, but rather simply to show that the statements were made. Thus, the hearsay rule does not bar this testimony."); *accord Sears, Roebuck & Co. v. Kunze*, 996 S.W.2d 416, 427 (Tex. App.—Beaumont 1999, pet. denied); *City of Austin v.*

83

*Houston Lighting & Power Co.*, 844 S.W.2d 773, 791 (Tex. App.—Dallas 1992, writ denied); *see also In re Morrison*, 555 F.3d 473, 483 (5th Cir. 2009) ("Testimony offered to prove that the party had knowledge or notice is not hearsay because 'the value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay.'") (citations omitted); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1164 (9th Cir. 2009) ("If the significance of an offered statement lies solely in the fact that it was made . . . the statement is not hearsay.") (citation omitted); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.") (citations omitted); *Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 325 (10th Cir. 1989) (articles regarding health problems were not hearsay because they were offered to prove "whether the defendant had notice of the potential dangers its product posed to consumers" as opposed to "the truth of the matter asserted"); *United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) ("Evidence introduced to prove merely that notice was given is not offered to prove the truth of the matter asserted therein and, therefore, is not hearsay.") (citing *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir. 1981)); *cf. Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 232 (7th Cir. 2021) (reports were not hearsay because they were offered to prove Wexford was on notice of their contents); *United States v. Gold*, 743 F.2d 800, 817-18 (11th Cir.1984) (employees' testimony was admissible as non-hearsay to establish conspirators had reason to know their activities were illegal).

Accordingly, we overrule Appellants' fifth issue.

## VI.    The Jury's Award of Future Medical Care Expenses

Question No. 10 asked the jury "[w]hat sum of money, if paid now in cash, would provide fair and reasonable compensation for Brianna Blake's injuries, if any,

84

that resulted from the occurrence in question?" The jury was asked to assess compensation across seven categories of damages. One category addressed "[m]edical care expenses that, in reasonable probability, Brianna Blake will incur in the future." The jury responded "$43,187,994.00".

Appellants assert in their sixth issue that the jury's $43,187,994 assessment for future medical care expenses is unsupported by the evidence because "the Blakes failed to offer evidence of the properly calculated present value of those expenses." To support this contention, Appellants challenge testimony from the Blakes' retained forensic economist, Robert Johnson, and assert that his "methodology and opinion are badly flawed."

With respect to Brianna's future medical care expenses, the jury first heard testimony from Dr. Shelly Savant, who testified with respect to the life care plan she created for Brianna. Dr. Savant described a life care plan as "a medical treatment plan wherein you provide services to a patient and you extend these services over the course of their life expectancy if they need those services for that long." Dr. Savant testified that she calculated Brianna's life expectancy to be 72 years and, since Brianna was 16 years old at the time of trial, her life care plan included services for 56 years.

Dr. Savant calculated two options for Brianna's life care plan. Under the first option, Brianna would "live at home with all of her treatment and attendant care." Dr. Savant testified that this life care plan, extended over 56 years, would cost $25,274,112.14. Under the second option, Brianna would reside in a residential treatment facility. Dr. Savant testified that this life care plan, extended over 56 years, would cost $33,575,830.14.

According to Dr. Savant, neither her first nor second option took into account inflation or other economic considerations. Dr. Savant said these options were valued as "how much [Brianna's] care would cost if you paid for it today."

Afterwards, forensic economist Robert Johnson testified regarding the net discount rate he used to assess the present value of Dr. Savant's life care plans. According to Johnson, his net discount rate calculated the intersection between (1) the interest rate and (2) two applicable rates of inflation — one that tracked medical inflation and one that tracked non-medical inflation. Johnson testified that his calculations relied on a 4.4% interest rate, which was the statistical average rate for United States government bonds. With respect to medical inflation, Johnson testified that, according to the Medical Consumer Price Index, medical costs would be subject to a 5.3% inflation rate. With respect to non-medical inflation, Johnson testified that the rate would be 3.7% under the Consumer Price Index.

According to Johnson, he took Dr. Savant's life care plans and separated their items into two categories: one for "those items that are going to grow with the regular Consumer Price Index, CPI," and a second for "those items that are going to grow with the Medical Consumer Price Index, the MCPI." Johnson said that "[e]ach singular item in the life care plan either goes into the MCPI or the CPI column and with whatever the frequency [Dr. Savant] said it should be incurred."

Johnson testified that in Dr. Savant's first life care option (where Brianna would live at home), the items that would grow with the MCPI totaled $18,128,195 and the items that would grow with the CPI totaled $8,939,570, for a total present value of $27,068,195. With respect to Dr. Savant's second life care option (where Brianna would live in a residential treatment facility), Johnson testified that the items that would grow with the MCPI totaled $42,560,611 and the items that would grow with the CPI totaled $627,383, for a total present value of $43,187,994.

86

Challenging this testimony on present value, Appellants contend that "Johnson's methodology and opinion are badly flawed."

In personal injury actions, the factfinder must assess damages to accrue in the future on the basis of their dollar amount if they were presently paid in cash. *See Mo. Pac. R.R. Co. v. Kimbrell*, 334 S.W.2d 283, 286 (Tex. 1960). Texas law does not require specific evidence of the discount rate; rather, the factfinder is qualified to make a discount calculation. *Jenkins v. Jenkins*, 991 S.W.2d 440, 448 (Tex. App.—Fort Worth 1999, pet. denied); *Marshall v. Telecomm. Specialists, Inc.*, 806 S.W.2d 904, 909 (Tex. App.—Houston [1st Dist.] 1991, no writ).

Here, the Blakes presented evidence with respect to the discount rate applicable to Brianna's future medical expenses in the form of Johnson's testimony. Other courts have held that present value calculations similar to those employed by Johnson are credible. *See, e.g.*, *Smith v. United States*, No. 1:16-cv-00690-CL, 2018 WL 5816653, at *5-6 (D. Or. Nov. 6, 2018) (the plaintiff's expert employed a higher inflation rate with respect to "most medical care items and personal care services" included in the plaintiff's future medical expenses; the court noted that it found the plaintiff's expert's "qualifications, methodology, and calculations . . . creditable"); *Oberson v. United States*, 311 F. Supp. 2d 917, 950 (D. Mont. 2004) (to compute the present value of the plaintiff's life care plan, the court applied different rates of inflation for different categories of medical expenses).

Werner raises several specific arguments with respect to Johnson's testimony: (1) Johnson "has never applied his negative 'net discount rate' theory outside of litigation"; (2) Johnson "did not analyze the future cost of any specific items in Savant's life care plan"; and (3) Johnson's inflation rate tracked the price of goods from 1950 through 2016, "a period that consists almost entirely of 'aberrational years' of high inflation." But these arguments generally go to the weight of

Johnson's testimony — a factor for the jury to consider in evaluating the credibility of that testimony. *See Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.—Houston [1st Dist.] 1995, no writ) ("The weakness of facts in support of an expert's opinion generally go to the weight of the testimony rather than its admissibility."). Indeed, these issues and others were addressed in Appellants' cross-examination of Johnson. Although this conflicting evidence raised a question of fact, it does not render Johnson's testimony legally insufficient to support the future medical expenses award. *See Polk Cty. v. Tenneco, Inc.*, 554 S.W.2d 918, 924 (Tex. 1977) (attack on figures underlying expert's opinion goes to the weight rather than admissibility of the testimony); *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied) (lack of supporting market data is a factor for the jury to consider in determining the credibility of the expert's opinion).

Accordingly, we conclude that Dr. Savant's testimony about Brianna's life care plans combined with Johnson's testimony concerning the plans' present value constitute sufficient evidence to support the jury's award of $43,187,994.00 for Brianna's future medical care expenses. We overrule Appellants' sixth issue.

## CONCLUSION

In conclusion, we overrule Appellants' issues and affirm the trial court's July 30, 2018 final judgment.

/s/     Meagan Hassan
Justice

En banc court consists of Chief Justice Christopher and Justices Wise, Jewell, Bourliot, Zimmerer, Spain, Hassan, Poissant, and Wilson.  Justice Hassan authored the En Banc Majority Opinion, in which Justices Bourliot, Zimmerer, Spain, and Poissant joined.  Chief Justice Christopher authored an En Banc Dissenting Opinion, in which Justices Wise, Jewell, and Wilson joined as to Part I and Part II.A for the reasons stated in page 6 and footnote 14 of Justice Wilson's En Banc Dissenting Opinion.  Justice Wilson authored an En Banc Dissenting Opinion, in which Justices Wise and Jewell joined.